# United States Court of Appeals
## For the First Circuit

No. 15-1174

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN C. JORDAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Thompson, Circuit Judges.

Inga L. Parsons on brief for appellant.
Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Sue, Deputy Assistant Attorney General, David M. Lieberman, Attorney, Criminal Division, Appellate Section, United States Department of Justice, Carmen M. Ortiz, United States Attorney, and Stephen E. Frank and Sarah E. Walters, Assistant United States Attorneys, on brief for appellee.

March 2, 2016

**SELYA**, **Circuit Judge**.  Defendant-appellant John C. Jordan once again appeals from the imposition of sentence.  This time around, he advances two claims of sentencing error.  First, he asserts that the district court abused its discretion in admitting certain expert testimony at sentencing.  Second, he asserts that the court committed clear error in determining the amount of the loss attributable to the offense of conviction.  Concluding, as we do, that these claims of error are fruitless, we affirm.

We sketch the background.  The reader who hungers for more exegetic detail should consult our opinion regarding the defendant's earlier appeal.  See United States v. Prange, 771 F.3d 17, 21-25 (1st Cir. 2014).[1]

In 2011, the Federal Bureau of Investigation (FBI) mounted a sting operation designed to ferret out fraud in the market for penny stocks (securities typically traded at less than $5 per share and not listed on any organized stock exchange).  In the typical iteration of the sting, an undercover agent, posing as a corrupt hedge fund manager, would propose a deal to executives of a small public company: the agent would offer to overpay for restricted shares of a company's stock, in return for a kickback

---

[1] Prange and Jordan were codefendants in the underlying criminal case.  They were tried and convicted together.  Because Prange is not a party to this appeal, we make no further mention of him.

(disguised as a consulting fee) equal to 50% of the amount invested.

The defendant, then the president and chief executive officer of Vida Life International Ltd. (Vida Life), bought into the FBI's sting. After being approached by an undercover agent in August of 2011, the defendant agreed that his company would sell 400,000 restricted shares[2] for an aggregate price of $32,000 to the fictitious hedge fund. Once the sale was effected, the defendant kicked back one-half of the investment.

In due course, a federal grand jury indicted the defendant for conspiracy to commit securities fraud, see 18 U.S.C. §§ 1348, 1349, and several counts of mail and wire fraud, see id. §§ 1341, 1343, 1349. A ten-day jury trial ended in the defendant's conviction on all charges and, on August 12, 2013, the district court sentenced the defendant to a 30-month term of immurement for the fraud offenses.

In fraud cases, the amount of actual or intended loss is an important integer in the calculation of a defendant's guideline sentencing range (GSR). USSG §2B1.1(b)(1) & comment. (n.3(A)(i)-(ii)); United States v. Lilly, 13 F.3d 15, 17 (1st Cir. 1994). Here, the defendant's sentence was at the nadir of his GSR — a

_____

[2] The Vida Life shares were subject to a one-year holding period and, thus, could not have been sold on the open market until August of 2012.

range based partly on the court's determination that the defendant should be held accountable for a loss of $32,000 (the full amount of the purchase price of the shares).

On the defendant's initial appeal, we affirmed his convictions. See Prange, 771 F.3d at 37. However, we vacated his sentence for securities fraud after finding procedural error in the district court's calculation of the loss amount. See id. at 21, 35-37. We remanded for resentencing, directing the district court, en route to its calculation of the loss amount, to make factual findings regarding the value of the Vida Life shares acquired by the FBI. See id. at 37.

On remand, the parties offered conflicting expert testimony anent the value of the Vida Life shares in the form of competing affidavits.[3] The government proffered the affidavit of Thomas Carocci, senior counsel for the Financial Industry Regulatory Authority (FINRA). Carocci concluded that the 400,000 shares of restricted Vida Life stock had no value, so the amount of loss equaled the full price paid for the shares ($32,000). The defendant proffered the affidavit of James Watts, an investment banker. Employing a "subjective" approach to the valuation of micro-cap stocks, Watts concluded that "a per share price equal to half the amount invested . . . represents a price an investor

_____

[3] Both of the affiants had testified during the criminal trial.

- 4 -

. . . would pay."  Under Watts' valuation, the Vida Life shares were worth $16,000 and the amount of the loss was also $16,000 — a figure representing the amount paid for the stock less the kickback.

The court below credited the government's expert, fixed the loss amount at $32,000, and again sentenced the defendant to serve 30 months in prison.  This timely appeal followed.

In this venue, the defendant first challenges the admission of Carocci's testimony.  He argues that Carocci was not qualified to offer an expert opinion on the value of Vida Life's shares and that, in all events, Carocci's methodology was flawed.

We review a district court's decision to admit or exclude expert testimony for abuse of discretion.  See Samaan v. St. Joseph Hosp., 670 F.3d 21, 31 (1st Cir. 2012).  In carrying out that review, we afford "broad deference to the determination made by the district court as to the reliability and relevance of [the] expert testimony."  Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 25 (1st Cir. 2006).  Absent a material error of law — and we discern none here — we will not second-guess such a discretionary determination unless it appears that the trial court "committed a meaningful error in judgment."  Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 83 (1st Cir. 1998) (quoting Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988)).

Federal Rule of Evidence 702 furnishes the relevant benchmark. Under this rule, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if: (1) his "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) his "testimony is based on sufficient facts or data"; (3) his "testimony is the product of reliable principles and methods"; and (4) he "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. We conclude, without serious question, that Carocci's opinion testimony comported with the strictures of Rule 702 and that the decision to admit it fell comfortably within the encincture of the district court's discretion.

To begin, Carocci's educational and professional background evinces broad experience in the fields of corporate finance, compliance, and enforcement. Carocci is both a college graduate (with majors in finance and economics) and a law school graduate. He has held responsible positions both at NASD and at a major investment bank (Goldman, Sachs & Co.). In his current role as senior counsel for FINRA (the principal self-regulatory agency for the securities industry), Carocci has spent five years investigating securities-related crimes, including the backdating of options, market manipulations, and insider trading. On its

face, Carocci's curriculum vitae belies the defendant's self-serving assertion that Carocci lacked the relevant knowledge, experience, or education to proffer an expert valuation. Consequently, we find no abuse of discretion in the district court's determination that Carocci was qualified to offer a valuation of the Vida Life stock.

Relatedly, the defendant assails Carocci's method of valuing Vida Life's stock. In his view, Carocci relied on "principals [sic] of guesswork." But this is empty rhetoric: Carocci charted the share price and volume of Vida Life stock trades between September 2011 and January 2014 (the approximate interval between the FBI's stock purchase and the last day of trading for Vida Life shares) and explained that share price and trading volume data supplied reliable evidence of how the market would have valued the 400,000 Vida Life shares held by the government. This data provided a logical basis for Carocci's opinion, and no more was exigible under Rule 702. See Breidor v. Sears, Roebuck & Co., 722 F.2d 1134, 1138-39 (3d Cir. 1983). From that point forward, the credibility and weight of the expert's opinion was for the factfinder. See id.

The defendant has a fallback position. He contends that Carocci should have appraised the restricted shares based on their value at the point of sale, not on their value after the sale was consummated. The defendant premises this contention on a guideline

commentary stating that a loss amount "shall be reduced" based on "the fair market value of the property returned [by the defendant] . . . to the victim before the offense was detected." USSG §2B1.1, comment. (n.3(E)(i)). But this comment has no bearing here: the defendant fraudulently sold 400,000 Vida Life shares, and this fraudulent sale formed the predicate for the defendant's conviction. Viewed against this backdrop, there was never a legitimate "return" of property to the victim of the defendant's fraud.[4]

This brings us to the defendant's remaining assignment of error: his claim that the district court committed reversible error in crediting Carocci's opinion and determining that the 400,000 restricted shares of Vida Life stock were worthless.[5] We

_____

[4] At any rate, a loss calculation includes "[t]he reduction that resulted from the offense in the value of equity securities or other corporate assets." See USSG §2B1.1, comment. (n.3(C)(v)) (emphasis supplied). It necessarily follows that when valuing the 400,000 Vida Life shares purchased by the FBI, the district court was bound to consider whether the defendant's criminal conduct reduced the worth of the stock. Such an inquiry would be totally frustrated without considering changes in the value of the shares after the date of sale.

[5] Based on this determination, the district court set the amount of the loss at $32,000; that loss amount triggered a six-level increase in the defendant's offense level under the then-applicable sentencing guidelines, see USSG §2B1.1(b)(1)(D) (Nov. 2012); and — combined with other guideline calculations that are not challenged here — that six-level adjustment yielded a GSR of 30-37 months. A loss amount less than $30,000 would have supported only a smaller offense-level adjustment. See id. §2B1.1(b)(1)(C). That would have shrunk the GSR, and had the GSR been lower, it is likely that the defendant's sentence would also have been lower.

review a district court's factual findings at sentencing, including its loss calculations, for clear error. See United States v. Innarelli, 524 F.3d 286, 290 (1st Cir. 2008).

At bottom, this is a case of dueling experts. Carocci concluded that the restricted stock had "de-minimus or no value." In reaching this conclusion, he first noted that, during the "restricted" period, there was no private market for the purchase or sale of the stock. Carocci went on to examine the period from August of 2012 (when the Vida Life shares would have become unrestricted) to January of 2014 (when any Vida Life shares were last traded). He reasoned that, had the government tried to sell the 400,000 Vida Life shares, the market would have crashed completely, rendering the shares worthless.

To be sure, Watts expressed a different opinion. He concluded that the worth of the stock should be determined based on the subjective value placed on the securities by the parties at the time of the transaction. Using this methodology, he opined that the shares that remained in the government's possession were worth $16,000 (the purchase price paid by the FBI less the kickback amount).

Faced with these sharply conflicting views, the district court found that "the unrestricted shares of Vida Life during the relevant time period had little or no market value." This finding was supported by Carocci's opinion. It was also supported by the

trading data, which showed that even the unrestricted Vida Life stock traded very infrequently, in small amounts, and at meager prices. Extrapolating from this data, the district court reasonably determined that the 400,000 shares of restricted stock were "worth less than the unrestricted shares."

We add that weaknesses in Watts' valuation method may help to explain why the district court chose to credit Carocci instead of Watts. For instance, Watts' methodology assumed that the undercover agent and the defendant negotiated a price that accurately reflected the actual value of the restricted shares. But this assumption was contradicted by the record: the undercover FBI agent told the defendant that he planned to overpay for the Vida Life stock.

So, too, Watts' valuation method assumed that Vida Life intended to use the capital furnished by the FBI to carry out its business plan. Yet the record shows with conspicuous clarity that Vida Life had no such plans. Rather, the defendant lost no time in diverting the capital infusion into personal accounts.

That ends this aspect of the matter. Where, as here, expert testimony is in sharp conflict, an appellate court must defer in large measure to the trial court's superior point of vantage. See United States v. Wetmore, ___ F.3d ___, ___ (1st Cir. 2016) [No. 15-1522, slip op. at 9]. After all, "[i]t is not [this court's] place to re-weigh the credibility of witnesses or

to determine the weight accorded to [an] expert witness." United States v. Volungus, 730 F.3d 40, 48 (1st Cir. 2013). When dueling experts have each rendered a coherent and facially plausible opinion, the trial court's decision to adopt one and reject the other cannot be clearly erroneous. See Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985). So it is here.

We need go no further. For the reasons elucidated above, the judgment of the district court is

**Affirmed.**