In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 15-3589 & 15-3601

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANNA F. NOVAK AND JOHN C. MORRISON,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Western District of Wisconsin.
No. 14-cr-121 — **James D. Peterson**, *Judge.*

ARGUED SEPTEMBER 28, 2016 — DECIDED NOVEMBER 9, 2016

Before POSNER, FLAUM, and MANION, *Circuit Judges.*

FLAUM, *Circuit Judge.* Defendants-appellants John Morrison and Anna Novak both pled guilty to distributing a controlled substance analog and to tax fraud. The district court accepted their guilty pleas and later sentenced Morrison to forty-eight months of incarceration and Novak to ninety-six months. They now appeal, challenging the constitutionality of the Controlled Substances Analogue Act, 21 U.S.C. § 813

(the Analogue Act), the district court's acceptance of their guilty pleas, and their sentences. We affirm.

## I. Background

From approximately November 2009 through September 2013, Morrison and Novak sold substances they referred to as "herbal incense" from their retail store, JC Moon, in Ashland, Wisconsin. These substances included XLR-11, UR-144, PB-22, and 5F-PB-22, which at the time were not listed on the controlled substance schedules but were similar to scheduled controlled substances. Between November 2012 and July 2013, undercover law enforcement officers made twenty-eight controlled purchases of various substances from JC Moon.

Through undercover interviews with Novak, the government learned that appellants hid a significant portion of their cash income from the IRS. Novak directed JC Moon employees to take all $50 and $100 bills from the cash registers and put them in Novak and Morrison's safe. These bills never went into JC Moon's business bank account. This artificially low business income information was provided to the appellants' tax preparer; as a result, the "skimmed" cash was not included on the returns and not reported to the IRS. From 2010 to 2012, appellants under-reported JC Moon's business income by approximately $575,752 for a tax loss of $186,095.

On December 10, 2014, a federal grand jury returned a thirty-five-count indictment against Novak and Morrison. These counts included the Analogue Act and tax fraud counts to which Novak and Morrison would eventually plead guilty.

On May 5, 2015, Novak and Morrison moved to dismiss the thirty indictment counts alleging either conspiracy or substantive distribution charges. Appellants argued before the district court that the Analogue Act was unconstitutionally vague as applied to XLR-11 and several other analogues involved in the case. On July 24, 2015, the court denied Novak and Morrison's motion to dismiss.

On August 27, 2015, Novak and Morrison pled guilty to one count each of distributing a controlled substance analogue—XLR-11—and to tax fraud. The plea agreements were unconditional and did not reserve the right to appeal the previously-denied motion to dismiss.

At Morrison's change of plea hearing, the district court reviewed the maximum penalties and asked whether Morrison understood the proceedings. The government then summarized the evidence it would submit at trial on the Analogue Act charge, including employee and customer testimony that appellants sold synthetic marijuana as "herbal incense" from a back room at JC Moon; a Facebook post indicating that appellants sold XLR-11 after they knew it was scheduled to be treated as a controlled substance;[*] undercover agent testimony regarding a May 2, 2013 XLR-11 purchase; expert testimony demonstrating the physiological-effects and chemical-

---

[*] The May 2, 2013 post read: "The federal government is banning the current herbal incense on May 13, 2013. What that means for us is everything we are selling right now will be banned as of May 13. Our inventory is limited. We may run out before then. We will keep you posted." The government said it also would have submitted evidence that XLR-11 was to be officially treated as a controlled substance on May 16, 2013, but that the notice of this change had been publicized earlier.

structural similarities between XLR-11 and JWH-18, a controlled substance; and lay witness testimony from JC Moon customers regarding the effects of XLR-11. Morrison then agreed that the government could have proved all of the above facts.

When questioned, both appellants vacillated between knowing and not knowing that XLR-11 was similar to controlled substances while they were selling it. When the court first asked Morrison to explain the distribution offense in his own words, he said,

> I didn't realize I was being charged with anything because I didn't think there was anything wrong with [the XLR-11] at the time. Because every time that something came down, we always stopped and … I didn't know. I'm sorry. I really didn't know it was illegal.

Morrison then said that he knew that people used the XLR-11 he sold to get high, he "thought it was like marijuana," and he knew marijuana was a controlled substance. However, when questioned further, Morrison stated that he did not know that XLR-11 was a controlled substance when he sold it and that he stopped selling it once he believed it became a scheduled controlled substance.

In response, the government said that XLR-11 was in fact not a scheduled controlled substance as of the date of the charged offense, May 2, 2013. Rather, the evidence showed that Morrison knew that XLR-11 *would* be treated as a controlled substance later that same month, yet continued to sell it after having that knowledge. The government continued,

> Mr. Morrison's forthright answers that he knew people were smoking, it means he knew it was for human consumption. He knew they were using it to get high, which we had a lot of proof of that and I knew he would say that, and then his acknowledgement that he thought it was like marijuana, a Schedule 1 controlled substance, I think is sufficient.
>
> One of the things *McFadden* [*v. United States*, — U.S. —, 135 S. Ct. 2298 (2015)] tells us is you can prove knowingly … by showing that the defendant knew the characteristics that would make it illegal even if he did not know its legal status as an analogue.… I would submit … that there are facts, circumstantial facts that he knew it produced a high. It could give rise to an inference. The Court could infer … that he then knew enough—that it would be an analogue even though he doesn't know its legal status as an analogue.

The district court concluded,

> I'm satisfied that there's a factual basis for the plea, despite Mr. Morrison's denials of the specific knowledge of the chemical involved or its specific legal status. But I think on the theory that [the government] described that … Mr. Morrison was familiar with the features of the products that he was selling that made them controlled substance analogues, … there is indeed a factual basis for the plea.

Morrison also initially seemed unsure about how his tax reporting worked. He was not aware of how much money JC Moon made in 2012 or how much business income it reported. He also said the he was unaware of the cash-skimming operation underlying the tax fraud. However, after speaking with his attorney, Morrison said, "We put the fifties and hundreds in the safe as a separate, and … the taxes were made out the way they were, I signed them and I'm guilty of it." Morrison also said that he and Novak gave their business income information—without including the $50 and $100 bills—to their tax preparer, and that Morrison signed the return. The court questioned Morrison on his ability to raise lack of knowledge as a defense to the tax fraud charge. Morrison responded that he knew and that he nevertheless wanted to plead guilty.

The court concluded,

> despite Mr. Morrison's denial, I think there is a factual basis … because of his knowledge of the treatment of the fifties and hundreds at the store, that he knew that the tax return that he signed was not an accurate tax return and that it understated the income ….

The district court conditionally accepted Morrison's guilty pleas pending a review of his presentence report.

The district court then proceeded with Novak's change of plea hearing. The court reviewed the maximum penalties and ensured that Novak understood the proceedings. The government noted that evidence from Morrison's change of plea hearing applied to Novak. Novak was present at the defense table during that recitation and waived a proffer of the same

evidence at her hearing, which took place directly after Morrison's. Novak agreed that the government could prove everything from Morrison's proffer. Then, like Morrison, Novak expressed some hesitation about the distribution charge. Novak initially said she thought XLR-11 was supposed to be tobacco, but then later realized it was not. Novak also stated that she did not know people smoked the substances sold at JC Moon.

After speaking with her attorney, Novak said she later learned that people were smoking the herbal incense, but that people were interested in its "relaxing effect." When asked if she knew that people used the substances to get high, Novak responded, "I don't like to use that terminology. [I]t affects everybody differently. Some it would relax; some would go to sleep; some would buzz …." Novak later admitted that JC Moon sold XLR-11 after Novak knew it had effects similar to marijuana.

When questioned about the May 2, 2013 Facebook post, Novak said she was out of the state and did not create the post but that she was "aware of a date coming up, this particular, and our wholesalers would say [XLR-11] is going to be banned and so we just posted that instantly, not knowing it was going to come back at us." The district court then found that there was a sufficient factual basis for accepting Novak's guilty plea on the distribution charge.

Regarding the tax fraud charge, Novak admitted that she knew the $50 and $100 bills were not reflected in the information she gave to the tax preparer, and that therefore the tax returns reflected fraudulently low business income. The court found that there was a sufficient factual basis for Novak's plea. The court conditionally accepted Novak's pleas pending

a review of the presentence report. Neither appellant objected to the factual basis for the guilty pleas or attempted to withdraw the pleas. Novak and Morrison did not orally reserve their rights to appeal the district court's earlier denial of their motion to dismiss.

On November 6, 2015, the district court formally accepted appellants' guilty pleas and sentenced them. At the hearing, the government called an expert who testified that XLR-11, UR-144, PB-22, and 5F-PB-22 had pharmacological effects substantially similar to THC and were at least as potent as THC. The expert also provided reasons why the substances were not most similar to marijuana. Five lay witnesses, all customers at JC Moon, testified to the effects of the substances. The court then found that THC was the closest controlled substance to the substances at issue. THC had a 1:167 marijuana equivalency ratio, used to calculate the base offense level under U.S.S.G. § 2D1.1. The district court applied the 1:167 ratio to the substances in this case.

The court sentenced Morrison to forty-eight months in prison on the Analogue Act charge and thirty-six months in prison on the tax fraud charge, with the sentences to run concurrently. The court sentenced Novak to ninety-six months in prison on the drug charge and thirty-six months in prison on the tax charge, with these sentences also running concurrently.

## II. Discussion

### A. Analogue Act Vagueness Challenge

Typically, we review de novo the district court's legal conclusions regarding the constitutionality of a statute. *United States v. Morris*, 821 F.3d 877, 879 (7th Cir. 2016). However, an

unconditional guilty plea waives appellate review of all non-jurisdictional pretrial issues. *United States v. Adams*, 125 F.3d 586, 588 (7th Cir. 1997). "An exception exists if the plea is conditioned on preserving specified issues for appeal," and although "[t]hat conditional plea should be in writing, … we have held that the conditions can also be sufficiently indicated in a transcript of the sentencing hearing." *United States v. Robinson*, 20 F.3d 270, 273 (7th Cir. 1994) (citing Fed. R. Crim. P. 11(a)(2); *United States v. Yasak*, 884 F.2d 996, 999 (7th Cir. 1989)).

The threshold question is therefore whether Novak and Morrison's vagueness challenge alleges jurisdictional, pre-plea defects that this Court may consider even after an unconditional plea. This Court has spoken directly on the issue: "While a facial attack on a statute's constitutionality is jurisdictional, an as-applied vagueness challenge is not." *United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011). To the extent that appellants make non-jurisdictional as-applied challenges to the Analogue Act, those arguments are waived. Their guilty pleas did not reserve the right to appeal the district court's denial of their motion to dismiss, and nothing in the record indicates that they preserved the issue during the hearings before the district court. To the extent that appellants facially attack the Analogue Act on vagueness grounds, the Supreme Court resolved this issue in the government's favor in *McFadden v. United States*, — U.S. —, 135 S. Ct. 2298, 2307 (2015) (holding that the Analogue Act is not unconstitutionally vague due to its scienter requirement).

## B. Guilty Pleas

Appellants next say they unknowingly and involuntarily entered their guilty pleas and argue the district court accepted

the pleas without a sufficient factual basis. Where, as here, a defendant makes no attempt to withdraw his plea in the district court, we review the claim for plain error. *United States v. Pineda-Buenaventura*, 622 F.3d 761, 770 (7th Cir. 2010). Likewise, we conduct plain-error review for the sufficiency of a factual basis to support a plea where the defendant failed to make such an objection below. *United States v. Arenal*, 500 F.3d 634, 637 (7th Cir. 2007).

### 1. Voluntariness

> Rule 11 requires that before the court accepts a plea of guilty or nolo contendere the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands[,] the nature of each charge to which the defendant is pleading.… To determine whether a defendant in fact understands the nature of a charge, we take a totality-of-the-circumstances approach and consider (1) the complexity of the charge; (2) the defendant's intelligence, age, and education; (3) whether the defendant was represented by counsel; (4) the district judge's inquiry during the plea hearing and the defendant's own statements; and (5) the evidence proffered by the government.

*Pineda-Buenaventura*, 622 F.3d at 770 (internal citations, quotation marks, brackets, and alterations omitted).

The balance of these factors leads to the conclusion that Morrison and Novak understood the nature of the charges

against them and that they knowingly and voluntarily entered their guilty pleas. First, while the complexity of Analogue Act charges can be difficult for defendants to grasp, the district court can alleviate this burden through careful questioning and explanation of the charges. *See United States v. Fernandez*, 205 F.3d 1020, 1026 (7th Cir. 2000); *United States v. LeDonne,* 21 F.3d 1418, 1423 (7th Cir. 1994). The district court in this case reviewed the elements of the Analogue Act and Controlled Substances Act with appellants and thoroughly questioned each on his or her knowledge of XLR-11's effects.

Second, Morrison was seventy-one years old at the time of the plea, had served in the Army, and had earned a GED. He had been operating businesses like JC Moon around Wisconsin for many years. English is his native language. Though there is some suggestion in the change of plea hearing that Morrison was suffering from the early stages of Alzheimer's, there is no indication that any such complications impacted his ability to understand the nature of the proceedings. Novak was fifty-eight years old when she pled guilty. She had graduated high school and had taken some college courses. She ran the operations of JC Moon. Previously, she had managed her own restaurant. English is also Novak's native language. Nothing about appellants' personal history indicated that either was unable to understand the proceedings or the nature of the charges.

Third, both Novak and Morrison were represented by counsel. Fourth, as explained above, the district court reviewed the nature of the charges with each appellant and dwelled on what each knew about XLR-11 and at what time. Finally, the government summarized, in plain language, the expert and lay witness testimony it expected to elicit at trial,

and both appellants agreed that the government could prove all of the facts mentioned. These factors, and the totality of the circumstances surrounding Novak's and Morrison's guilty pleas, indicate that they entered into those pleas voluntarily and with sufficient understanding of the charges against them.

### 2. Factual Basis

Appellants next argue the district court lacked a sufficient factual basis on which to accept their distribution pleas and Morrison's tax fraud plea. As to the Analogue Act charges, appellants say the government did not proffer, and the district court did not elicit, sufficient evidence of their knowledge about the chemical structure and effects of XLR-11. Alternatively, they contend that if the court found sufficient evidence to satisfy the knowledge requirement, it did so by impermissibly relying on a now-disfavored *Turcotte* inference. *See United States v. Turcotte*, 405 F.3d 515, 527 (7th Cir. 2005) (creating the "provisional remedy" of a rebuttable, permissive inference of knowledge in Analogue Act cases, such that a defendant knew about the chemical structure of an analogue if the government can show the defendant knew the analogue had similar physiological effects to those of a controlled substance).

The Analogue Act calls for analogues to be treated as controlled substances. 21 U.S.C. § 813. Though this statute does not itself contain any scienter requirements, courts have interpreted the Analogue Act to incorporate the knowledge requirement from federal laws prohibiting the distribution of scheduled controlled substances. That is, a defendant must have known that the substance in question was a controlled

substance or analogue, just as someone who distributes a con-
trolled substance must have known that he was dealing with
a controlled substance. *McFadden*, 135 S. Ct. at 2305 (citing 21
U.S.C. § 841(a)(1)). *McFadden* sets forth two ways in which the
government can satisfy this knowledge requirement:

> First, [knowledge] can be established by evi-
> dence that a defendant knew that the substance
> with which he was dealing is some controlled
> substance—that is, one actually listed on the
> federal drug schedules or treated as such by op-
> eration of the Analogue Act—regardless of
> whether he knew the particular identity of the
> substance. Second, it can be established by evi-
> dence that the defendant knew the specific ana-
> logue he was dealing with, even if he did not
> know its legal status as an analogue.

*Id.*

To satisfy the knowledge requirement the second way, the
Supreme Court further reasoned that the government must
show that a defendant knew the substance he is charged with
distributing had (1) a chemical structure substantially similar
to that of an already-scheduled controlled substance and (2) a
physiological effect substantially similar to or greater than the
effect of an already-scheduled controlled substance. *Id.*

Appellants are correct that after *McFadden*, courts can no
longer rely on the *Turcotte* inference to demonstrate a defend-
ant's chemical-structure and physiological-effects knowledge.
*Turcotte* effectively collapsed the second requirement (that the
defendant know the analogue had physiological effects simi-

lar to those of a controlled substance) into the first require-ment (that the defendant know that the analogue had a chem-ical structure substantially similar to that of a controlled sub-stance) in a way that is unsupported by *McFadden*'s reasoning. However, the government may still prove either through cir-cumstantial evidence. *McFadden*, 135 S. Ct. at 2304, n.1 ("Cir-cumstantial evidence could include, for example, a defend-ant's concealment of his activities, evasive behavior with re-spect to law enforcement, knowledge that a particular sub-stance produces a 'high' similar to that produced by con-trolled substances, and knowledge that a particular substance is subject to seizure at customs."); *id.* at 2306, n.3.

In the case at hand, considering the government's prof-fer—which both appellants admitted could be proven at trial—and appellants' admissions at the change of plea hear-ings, the district court had sufficient circumstantial evidence to satisfy the first *McFadden* knowledge requirement: appel-lants knew the substance in question was a controlled sub-stance or analogue.

As explained above, the parties agreed the government could prove at trial that appellants sold XLR-11 as "herbal in-cense" from the back of their store, JC Moon. While selling it, appellants learned from customers and employees that XLR-11 would give users a high. Novak admitted that she knew XLR-11 got people buzzed, and Morrison believed it was like marijuana. In other words, appellants knew XLR-11 was not meant to be used as incense; rather, they knew it was for smoking and that it would give a buzz or high similar to ma-rijuana. Most tellingly, JC Moon's May 2, 2013 Facebook post said, "The federal government is banning the current herbal incense on May 13, 2013. What that means for us is everything

we are selling right now will be banned as of May 13. Our inventory is limited. We may run out before then. We will keep you posted." Appellants knew XLR-11 was going to be treated as a controlled substance, yet they continued to sell it. In sum, there was enough evidence before the district court to find that appellants were aware of the specific analogue they were dealing with and its status as a controlled substance analogue. The court committed no plain error in concluding that it had a sufficient factual basis to accept Novak's and Morrison's guilty pleas on the Analogue Act charges.

The district court likewise had a sufficient factual basis on which to accept Morrison's guilty plea for tax fraud. Morrison initially hesitated to admit he knew about the cash-skimming scheme; however, he later admitted to knowing that the $50 and $100 bills went into his and Novak's safe, that the taxes were prepared without including income from the skimmed bills, and that he knowingly signed off on the artificially low tax returns. Furthermore, the district court informed Morrison that *not* knowing the submitted tax information was false would be a defense to the tax fraud charge. Morrison still pled guilty. Thus, the district court did not err in accepting Morrison's plea to the tax fraud charge.

### C. 1:167 Marijuana Equivalency Ratio

Finally, appellants argue the district court erred in finding that THC was the most closely related controlled substance to XLR-11, UR-144, PB-22, and 5F-PB-22 for purposes of calculating the offense level under U.S.S.G. § 2D1.1 cmt. n.6. The district court's conclusion that THC is the most closely related controlled substance to XLR-11, UR-144, PB-22, and 5F-PB-22 is a finding of fact we review for clear error. *United States v.*

*Malone*, 828 F.3d 331, 337 (5th Cir. 2016) (collecting cases); *United States v. Hall*, 101 F.3d 1174, 1176 (7th Cir. 1996).

Where a substance, such as XLR-11, is not listed in the Sentencing Guidelines, the Guidelines require application of the marijuana equivalent of the most closely related controlled substance. U.S.S.G. § 2D1.1 cmt. n.6. To make this finding, the Guidelines instruct the district court to consider (1) whether the unlisted substance has a chemical structure substantially similar to that of a controlled substance listed in the Guidelines; (2) whether the unlisted substance produces a pharmacological effect that is substantially similar to the effect produced by a controlled substance in the Guidelines; and (3) whether a lesser or greater amount of the unlisted substance is required to produce a pharmacological effect that is substantially similar to the effect produced by a controlled substance in the Guidelines. *Id.*

The government conceded at sentencing that none of the analogues involved in this case had a chemical structure similar to any controlled substance referenced in the Guidelines. The district court acknowledged that this factor was of no help in finding the most closely-related controlled substance for XLR-11. However, missing the first factor does not end the analysis. The government produced evidence on the latter two factors. At sentencing, the government called an expert witness and lay witnesses who testified that the substances had similar or stronger physiological effects to those of THC. The expert also elaborated on why the substances were like THC, and *not* like marijuana, which contains THC as one of its many chemicals. The expert also opined that less of the substances was needed to produce an effect compared to a given amount of THC. The district court was entitled to credit

that testimony and use it to find that the substances were most like THC. It follows that the district court did not err in applying the 1:167 marijuana equivalency ratio for THC to the substances involved in this case, or in calculating appellants' offense levels accordingly.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.