# United States Court of Appeals
## For the First Circuit

No. 16-2391

UNITED STATES OF AMERICA,

Appellee,

v.

LEDA GIGGEY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Kayatta, Selya and Barron,
Circuit Judges.

Matthew S. Erickson on brief for appellant.
Richard W. Murphy, Acting United States Attorney, Renée M.
Bunker, Assistant United States Attorney, Appellate Chief, and
Benjamin M. Block, Assistant United States Attorney, on brief for
appellee.

August 14, 2017

**SELYA**, **Circuit Judge**.  Controlled substances continue to cast a dark shadow over a large segment of American society.  That situation is made even worse by the proliferation of new permutations of such substances.  Synthetic cathinones, colloquially known as bath salts, represent one of these permutations, and we recently had occasion to warn that their illegal use was becoming a mounting problem in the District of Maine.  See United States v. Coombs, 857 F.3d 439, 443 & n.1 (1st Cir. 2017).

When drug offenses involve drugs not listed in the relevant tables incorporated in the sentencing guidelines, those drugs are converted into their marijuana equivalent for sentencing purposes.  See USSG §2D1.1, cmt. nn.6 & 8.  This appeal requires us, for the first time, to pass upon the method and manner in which that conversion is effected with respect to synthetic cathinones. The court below used a conversion metric grounded in its finding that methcathinone is the drug referenced in the sentencing guidelines that is most closely related to the synthetic cathinone alpha-pyrrolidinopentiophenone (alpha-PVP).  Using this metric, the court sentenced defendant-appellant Leda Giggey to a 72-month term of immurement.  Discerning no clear error, we affirm.

I.  BACKGROUND

We briefly rehearse the facts and travel of the case, drawing upon the plea agreement, the uncontested portions of the

presentence investigation report, and the transcript of the disposition hearing. See United States v. Del Valle-Rodríguez, 761 F.3d 171, 173 (1st Cir. 2014); United States v. Dietz, 950 F.2d 50, 51 (1st Cir. 1991). Between 2012 and 2015, the defendant procured 2,120.75 grams — more than 21,000 individual doses — of synthetic cathinones, some from local suppliers and some from China. During this period, she became one of the foremost dealers of bath salts in Aroostock County, Maine. After some time had gone by, law enforcement officers threw a monkey wrench into her drug-distribution business: they executed a search warrant at her residence and found 1.07 grams of alpha-PVP, a drug ledger, two digital scales, and a cellular telephone replete with incriminating text messages. The defendant's arrest followed apace.

In due course, the defendant pleaded guilty to conspiracy to distribute and possession with intent to distribute controlled and analogue substances. See 21 U.S.C. §§ 813, 841(a)(1), 846. Federal drug laws classify proscribed drugs in five separate schedules, which are updated on an annual basis. See id. § 812(a). Because alpha-PVP was not listed on any of these schedules until March of 2014, see Schedules of Controlled Substances: Temporary Placement of 10 Synthetic Cathinones into Schedule I, 79 Fed. Reg. 12,938, 12,941 (Mar. 7, 2014) (codified at 21 C.F.R. § 1308.11), the government prosecuted the defendant

under the Controlled Substance Analogue Enforcement Act of 1986 (Analogue Act), Pub. L. No. 99-570, §§ 1201-1204, 100 Stat. 3207-13, 3207-13 to -14 (codified at 21 U.S.C. §§ 802(32), 813). The Analogue Act facilitates the regulation of new drugs which, though not currently outlawed, exhibit substantial similarities to a controlled substance found in either Schedule I or II.[1]  See 21 U.S.C. § 802(32)(A).  The Analogue Act defines a "controlled substance analogue" as:

> [A] substance (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

Id.

---

[1] Schedule I is reserved for drugs with "no currently accepted medical use."  21 U.S.C. § 812(b)(1).  Schedule II covers drugs which, although they may have an accepted medical use, are such that "[a]buse of the drug . . . may lead to severe psychological or physical dependence."  Id. § 812(b)(2). Schedules III, IV, and V cover drugs of decreasing levels of potential abuse and dependence.  See id. § 812(b)(3)-(5).

- 4 -

Drug quantity is an important integer in the sentencing calculus for most controlled substance offenses. See United States v. Dunston, 851 F.3d 91, 94 (1st Cir. 2017). The sentencing guidelines implement this concept through, inter alia, the use of a Drug Quantity Table, see USSG §2D1.1(c), and Drug Equivalency Tables, see id. §2D1.1, cmt. n.8(D).

As a practical matter, less commonly used drugs and new drugs are frequently not referenced in these tables. In such cases, the drug must be converted into the marijuana equivalent quantity of the most closely related controlled substance listed in the guidelines. Here, the government argued that methcathinone (a Schedule I controlled substance) was the appropriate comparator for alpha-PVP. The defendant countered that pyrovalerone (a Schedule V controlled substance) was more closely related to alpha-PVP than methcathinone and, therefore, was the appropriate comparator. The defendant's sentence turned, to a large extent, on the outcome of this dispute: if methcathinone was deemed to be the proper comparator, the defendant's guideline sentencing range (GSR) promised to be appreciably higher.

The district court convened the disposition hearing on November 8, 2016. Drug quantity was hotly contested in motion papers filed prior to the hearing. As matters turned out, the district court had confronted this same quandary in an earlier case. See United States v. Brewer, No. 1:15-cr-00003, 2016 WL

3580614 (D. Me. June 28, 2016). Rather than reinventing the wheel, the court opted to incorporate by reference its previous analysis, which found methcathinone to be the most closely related controlled substance to alpha-PVP for sentencing purposes.[2] On that basis, the court found the defendant responsible for the equivalent of 805.89 kilograms of marijuana.[3]

With this finding as the linchpin, the court made certain offense-level adjustments (not relevant here), calculated the defendant's total offense level (30), and placed her in criminal history category I. These subsidiary findings yielded a GSR of 97-121 months. After considering the factors limned in 18 U.S.C. § 3553(a), the court imposed a downwardly variant sentence of 72 months' imprisonment. This timely appeal ensued.[4]

---

[2] Neither party has objected to the district court's reliance upon Brewer, and the defendant has raised no arguments other than those raised in Brewer. Because the district court relied on Brewer without making any new findings or adding any new analysis, our references to the district court's decision in this case necessarily refer to its findings and analysis in Brewer.

[3] The court also found the defendant responsible for an additional drug quantity after converting certain opioids into their marijuana equivalent. This incremental increase in overall drug quantity has no bearing on the issues before us.

[4] The plea agreement contains a waiver of the defendant's right to appeal from any sentence of 57 months or less. Given the length of the sentence imposed, this waiver has no effect on the defendant's appeal.

## II.  ANALYSIS

At the outset, we pause to review the methodology used to determine drug quantity for crimes involving prohibited drugs not specifically referenced in the sentencing guidelines.  To begin, the guidelines provide a series of base offense levels for controlled substance offenses.  See USSG §2D1.1.  The most common controlled substances (for example, heroin, cocaine, marijuana, and the like) appear in the Drug Quantity Table, which specifies particular base offense levels depending upon the drug type and quantity involved in a given offense.  See id. §2D1.1(c).  Many less common drugs are assigned ratios in the Drug Equivalency Tables, which permit conversion of a given quantity of any of these controlled substances into its "equivalent quantity of mari[j]uana."  Id. §2D1.1, cmt. n.8(A)(i); see United States v. Demers, 842 F.3d 8, 12 (1st Cir. 2016).  In such instances, sentencing courts "[u]se the offense level that corresponds to the equivalent quantity of mari[j]uana [in the Drug Quantity Table] as the base offense level for the [actual drug] involved in the offense."  USSG §2D1.1, cmt. n.8(A)(iii); see United States v. Hurley, 842 F.3d 170, 171-72 (1st Cir. 2016).

Although the Drug Quantity Table and the Drug Equivalency Tables together cover a broad array of controlled substances, these tables do not exhaust the universe of prohibited drugs.  When either a controlled substance or a controlled

substance analogue does not appear in either of the tables, the sentencing court must calculate the offender's base offense level using the marijuana equivalent of "the most closely related controlled substance" that is referenced in the tables. USSG §2D1.1, cmt. n.6; see Hurley, 842 F.3d at 171-72. To determine which drug is most closely related, three factors must be considered. They include

> (1) whether the unreferenced controlled substance has a chemical structure that is substantially similar to a controlled substance referenced in the guidelines;
>
> (2) whether the unreferenced controlled substance has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to the stimulant, depressant, or hallucinogenic effect of a controlled substance referenced in the guidelines;
>
> (3) whether a lesser or greater quantity of the unreferenced controlled substance is needed to produce a substantially similar effect on the central nervous system as a controlled substance referenced in the guidelines.

See USSG §2D1.1, cmt. n.6.

Once the proper comparator has been identified, the court calculates the unreferenced drug's marijuana equivalent using the marijuana equivalent value assigned to the comparator in the Drug Equivalency Tables. See id. §2D1.1, cmt. nn.6 & 8. The offender's base offense level is then established by comparing

- 8 -

this deduced marijuana equivalent quantity to the appropriate tier in the Drug Quantity Table. See id. §2D1.1(c) & cmt. nn.6 & 8.

In the case at hand, the defendant challenges the district court's selection of methcathinone as the appropriate comparator for alpha-PVP on two distinct grounds. First, she asserts that the district court erred by restricting its search for a comparator drug to Schedule I and II controlled substances. Second, she asserts that the court erred in finding that methcathinone was more closely related to alpha-PVP than pyrovalerone. We evaluate these claims of error separately.

## A.

The defendant's first claim of error posits that the sentencing court impermissibly limited its search for an alpha-PVP comparator to the universe of Schedule I and II controlled substances. As a result, the defendant says, the court excluded her preferred comparator, pyrovalerone, which is a Schedule V controlled substance. This amounts to a challenge to the district court's application of the sentencing guidelines, and we review the sentencing "court's interpretation and application of the sentencing guidelines de novo." United States v. Walker, 665 F.3d 212, 232 (1st Cir. 2011).

In this case, the district court, adopting its findings in Brewer, 2016 WL 3580614, at *11, concluded that, as a matter of law, only a Schedule I or Schedule II controlled substance can be

considered the most closely related drug to a controlled substance analogue not referenced in the sentencing guidelines. The plain language of the sentencing guidelines supports the conclusion that an analogue comparator must be a controlled substance selected from either Schedule I or II. The commentary to the relevant sentencing guideline states, in an application note, that "[f]or purposes of this guideline 'analogue' has the meaning given the term 'controlled substance analogue' in 21 U.S.C. § 802(32)." USSG §2D1.1, cmt. n.6. The statute, in turn, defines a controlled substance analogue as a substance that is "substantially similar" in chemical structure, pharmacological effect, and intended effect to "a controlled substance <u>in schedule I or II</u>." 21 U.S.C. § 802(32)(A) (emphasis added); see <u>McFadden</u> v. <u>United States</u>, 135 S. Ct. 2298, 2303-05 (2015).

It is a familiar tenet that the text of a statute "furnishes the most reliable guide to its interpretation." <u>United States</u> v. <u>Suárez-Gonzáles</u>, 760 F.3d 96, 99 (1st Cir. 2014). The same respect is accorded to the text of the sentencing guidelines. <u>See</u> <u>id.</u> Here, the plain language of both the statute and the application note indicate that the proper comparator for an unreferenced controlled substance analogue must be drawn from Schedule I or II. <u>See</u> 21 U.S.C. § 802(32)(A); USSG §2D1.1, cmt. n.6; <u>see</u> <u>also</u> <u>United States</u> v. <u>Emerson</u>, No. 2:15-cr-17, 2016 WL

1047006, at *5 (D. Vt. Mar. 10, 2016) (terming any other result "absurd").

But there is more to the story. Here, the district court — after stating that the controlled substance analogue must be chosen from the ranks of Schedules I and II — prudently assumed, favorably to the defendant, that pyrovalerone (the Schedule V controlled substance identified by the defendant) was eligible for consideration in the search for a suitable comparator to alpha-PVP. The court then proceeded to examine both methcathinone (the Schedule I controlled substance identified by the government) and pyrovalerone in order to determine which drug was most closely related to alpha-PVP. It was only after this detailed examination of the competing candidates proposed by the parties that the court concluded that methcathinone was the proper comparator.

That ends this aspect of the matter. As we recently explained, "courts should not rush to decide unsettled issues when the exigencies of a particular case do not require such definitive measures." Privitera v. Curran (In re Curran), 855 F.3d 19, 22 (1st Cir. 2017). So it is here: the sentencing court's prophylactic approach obviates the need for us to make a definitive holding as to whether the proper comparator for a controlled substance analogue can be chosen only from the possibilities presented by Schedules I and II. Because the sentencing court went the extra mile and thoroughly considered the Schedule V drug

proposed by the defendant in its search for the proper comparator, it would be gratuitous to decide whether the court's search should have been limited to Schedules I and II. Given the breadth of the inquiry actually undertaken by the court, any error in stating that the search should be restricted to Schedules I and II was manifestly harmless. See, e.g., United States v. Alphas, 785 F.3d 775, 780 (1st Cir. 2015) (explaining that "an appellate court may deem such an [alleged] error harmless if, after reviewing the entire record, it is sure that the error did not affect the sentence imposed").

## B.

This brings us to the defendant's plaint that the sentencing court erred in determining that methcathinone was the controlled substance referenced in the sentencing guidelines that corresponds most closely to alpha-PVP. Typically, findings of fact at sentencing are reviewed for clear error. See, e.g., Walker, 665 F.3d at 232. It is an open question in this circuit, though, whether a district court's selection of the most closely related controlled substance is a factual or a legal determination.

Withal, we do not write on a pristine page. Several of our sister circuits have held that such a determination is a factual matter and, thus, engenders review only for clear error. See, e.g., United States v. Novak, 841 F.3d 721, 730 (7th Cir. 2016); United States v. Malone, 828 F.3d 331, 337 (5th Cir. 2016);

United States v. Ramos, 814 F.3d 910, 918 (8th Cir. 2016); United States v. Chowdhury, 639 F.3d 583, 585-86 (2d Cir. 2011) (per curiam).  We share this view, and we proceed to assay the district court's "comparator" finding for clear error.[5]  That standard of review is deferential: it requires that we accept findings of fact and inferences drawn therefrom unless, "on the whole of the record, we form a strong, unyielding belief that a mistake has been made." Demers, 842 F.3d at 12 (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)).

Here, the district court did not clearly err.  The court methodically subjected the two proposed comparators — methcathinone and pyrovalerone — to the prescribed tripartite test:  it inspected and contrasted the chemical structure, pharmacological effect, and potency of each drug.  What is more, the court painstakingly conducted this inquiry through the prism of competing expert testimony and evidentiary proffers purporting to show which drug should be deemed more closely related to alpha-PVP.

---

[5] While we review the district court's factfinding on the designated factors only for clear error, we reserve the right, in an appropriate case, to review the net result of that combined factfinding on a less deferential standard.  Cf. Ornelas v. United States, 517 U.S. 690, 691, 699 (1996) (explaining that factual findings underlying probable cause determinations are reviewed for clear error but determination of "ultimate question[]" as to whether probable cause exists is reviewed de novo).

In its analysis, the court determined that both methcathinone and pyrovalerone were substantially similar in chemical structure to alpha-PVP (even though pyrovalerone was somewhat "more similar . . . in its chemical structure"). The court next determined, based principally on the proffered expert testimony, that both drugs were substantially similar in pharmacological effect to alpha-PVP. Last — but far from least — the court determined that methcathinone more closely resembled alpha-PVP in potency. In this regard, the court stated that "[a]lpha-PVP is more potent than methamphetamine, and thus is at least as potent as methcathinone."[6] The court found that the defendant had not proven pyrovalerone to be as potent.

After a thorough review of the record, we conclude that the district court did not clearly err in finding that methcathinone is the drug referenced in the sentencing guidelines that is most closely related to alpha-PVP. The district court found the government's expert evidence more persuasive, and we have said that "[w]hen dueling experts have each rendered a coherent and facially plausible opinion, the trial court's decision to adopt one and reject the other cannot be clearly

---

[6] This finding is of a piece with the defendant's admission at sentencing that alpha-PVP "is a powerful, highly addictive poisonous chemical that left me with a mind riddled with poor judgment."

erroneous." United States v. Jordan, 813 F.3d 442, 447 (1st Cir. 2016). That is precisely the situation here.

In an effort to undermine the district court's factfinding, the defendant emphasizes that pyrovalerone was found to be closer in chemical structure. This emphasis, however, ignores the district court's supportable findings regarding the two remaining guideline factors. When all is said and done, a sentencing court is not obliged "to match substances under each of the factors." Chowdhury, 639 F.3d at 586. So, for example, a substance that is not the best fit in terms of chemical structure may still be the most appropriate comparator because of substantially similar pharmacological effect and potency. See Novak, 841 F.3d at 730.

In this instance, the district court, after taking each of the three prongs of the test into consideration, found that, on the whole, methcathinone was the most closely related controlled substance to alpha-PVP. Pertinently, the district court gave significant weight to potency, finding that alpha-PVP packed a punch comparable to methcathinone, and that there was no proof that pyrovalerone was as powerful. Put simply, the court's rationale rests heavily (and logically) on the similarity in potency between methcathinone and alpha-PVP. The plausibility of this rationale is not weakened simply because the court "did not weigh the factors as the [defendant] would have liked." Coombs,

857 F.3d at 452. The short of it is that the court's careful calibration of the decisional scales gives us confidence that its analysis was not clearly erroneous. See United States v. Platte, 577 F.3d 387, 394 (1st Cir. 2009) (finding no clear error when drug quantity determination was "supported by a sensible (though not inevitable) view of the record").

In all events, the defendant's argument fails on its own terms. Her factual challenge hinges on the notion that pyrovalerone would be a better choice as a comparator than methcathinone, not that methcathinone is an implausible choice (a point the defendant freely concedes when she states, in her appellate brief, that "there is ample evidence on the record to support the sentencing [c]ourt's finding"). This approach runs headlong into the settled rule that "where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous." United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990).

In a last-ditch effort to turn the tables, the defendant invokes the rule of lenity. She argues that because both methcathinone and pyrovalerone could be recognized as comparators, we should mandate the use of the latter because doing so will result in a markedly diminished sentence. This argument is hopeless.

"The rule of lenity generally applies to criminal statutes that are subject to more than one plausible interpretation and demands that the interpretation more favorable to the defendant prevail." Suárez-Gonzáles, 760 F.3d at 101. When statutory ambiguity is wholly absent, any "concerns that may be redressed through an application of the rule of lenity" are also absent. United States v. Aponte-Guzmán, 696 F.3d 157, 160 (1st Cir. 2012); see Suárez-González, 760 F.3d at 101. Here, the defendant advances no claim of statutory ambiguity but, rather, merely reprises her factbound claim that pyrovalerone is a better comparator to alpha-PVP than methcathinone. Seen in this light, the defendant's attempt to embrace the rule of lenity necessarily fails.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, the sentence is

**Affirmed.**