# United States Court of Appeals
## For the First Circuit

No. 25-1131

LUCIA URIZAR-MOTA; SERGIO REYES, individually and p.p.a. of
S.R., W.R., and G.R.; DELMY REYES; S.R.; W.R.; G.R.,

Plaintiffs, Appellees,

v.

UNITED STATES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Gelpí, Thompson, and Dunlap,
Circuit Judges.

Kevin M. Bolan, Assistant U.S. Attorney, with whom Sara Miron
Bloom, Acting United States Attorney, and Lauren S. Zurier,
Assistant U.S. Attorney, were on brief, for Appellant.

Katelyn M. Revens, with whom Amato A. DeLuca and DeLuca,
Weizenbaum, Barry & Revens, Ltd., were on brief, for Appellees.

March 27, 2026

**DUNLAP**, **Circuit Judge**.    This appeal involves a negligence claim brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80, by Plaintiff-Appellee Lucia Urizar-Mota ("Urizar-Mota"), a homemaker and mother of four. Urizar-Mota alleged that her doctors and nurse practitioner at Providence Community Health Center ("PCHC"), a federally funded health center, breached their duty of care by failing to refer her to a neurologist or for neuroimaging that could have detected a slow-growing tumor in the fourth ventricle of her brain.  Instead, the tumor -- left undetected -- grew and caused an abnormal buildup of cerebral fluid.  During the eventual surgery to resect the tumor, Urizar-Mota suffered cerebellar strokes, resulting in permanent neurological damage that continues to impact her mobility and daily life functions -- including her provision of homemaker services to her husband and children.  After motions practice and then a bench trial, the district court awarded Urizar-Mota damages for post-diagnosis medical expenses; pre- and post-diagnosis pain and suffering; and homemaker loss.  Further, the court awarded Urizar-Mota's children damages for loss of consortium.  This appeal followed.  We affirm in part and reverse in part, remanding for further proceedings regarding determination of homemaker damages.

**I.**

**A.    Relevant Facts in the Trial Record**

Starting in 2006, Urizar-Mota regularly visited PCHC for primary, obstetrical, optometry, and behavioral health care.  Over the course of nine different visits to PCHC from November 14, 2012 to June 19, 2019, Urizar-Mota told her primary-care providers that she had been experiencing headaches, but they never referred her to a neurologist or for neuroimaging.  They instead diagnosed her with migraines and prescribed Tylenol and migraine medication, even though she reported experiencing domestic abuse and presented symptoms -- headaches that lasted for weeks at a time and changed in pattern -- that, according to medical literature, are inconsistent with migraines and can signal a secondary cause of the headaches.

Seven years after Urizar-Mota reported experiencing weeks-long headaches with vomiting at her November 14, 2012 appointment, Urizar-Mota made an appointment at PCHC's express clinic for June 19, 2019, because her headaches had intensified. She was thirty-two years old at the time.  When she arrived, she lost consciousness in the parking lot.  She was then transported by ambulance to Rhode Island Hospital, where physicians performed a brain scan that showed an abnormal buildup of cerebral fluid -- called obstructive hydrocephalus -- and a mass in the fourth ventricle of her brain.

On June 24, 2019, five days after being admitted to the hospital, Urizar-Mota underwent surgery for a pilocytic astrocytoma -- a grade 1, slow-growing brain tumor. Normally the prognosis for patients with this type of tumor is excellent, with ninety percent of patients that undergo recission surgery suffering no permanent injuries. During her surgery, however, Urizar-Mota experienced cerebellar strokes that resulted in permanent neurological damage. After surgery, she spent six months in the hospital and rehabilitation center.

Urizar-Mota continues to experience tremors and movement disorders in her left hand, arm, and leg; abnormal and uncoordinated eye movements, causing blurry vision; tremors on the side of her mouth and lips; and balance and gait issues that prevent her from walking without mobility aids. She cannot perform standard movements effectively, such as putting on socks, removing her glasses, or slicing or chopping food; nor can she drive, clean, cook, or perform other types of housework. Her injuries hinder her ability to care for her four children, who at the time she became permanently injured were aged four, nine, eleven, and seventeen. Specifically, she can no longer drive her children to and from school, soccer practice, and other appointments, go to their school functions, or cook meals for them, and she requires assistance from family members for everyday tasks. She often feels depressed.

With the assistance of counsel, Urizar-Mota filed an administrative claim with the Department of Health and Human Services ("HHS") on October 5, 2020, asserting personal injury. See 28 C.F.R. § 14.2(a). Her submission included a Standard Form 95 ("SF-95"), which referred to a singular claimant (Urizar-Mota) and which only Urizar-Mota signed; her husband, Sergio Reyes, did not sign the form on his behalf, and neither he nor Urizar-Mota signed on their children's behalf. The SF-95 indicated that Urizar-Mota sought $20 million in damages, which she did not allot to any claims other than her own, such as any loss-of-consortium claims for her children. Conspicuous instructions on the SF-95 provided that a claim "must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as . . . parent," but Urizar-Mota's form did not indicate that she had authority to make a claim for her children, let alone that she was doing so. The form also instructed that each claimant seeking damages "should submit a separate claim form," but Urizar-Mota's husband and children never submitted SF-95s.

Along with her SF-95, Urizar-Mota submitted a letter from her attorney, which identified Urizar-Mota as the claimant, described the allegedly negligent care by PCHC and Urizar-Mota's resulting injuries and their effects on her family, and demanded $20 million in compensatory, pain and suffering, and "other"

- 5 -

damages. The letter included an overview of her medical records and enclosed copies of them, and it alluded to Urizar-Mota's homemaking duties and children by noting that she was "no longer able to manage the household as she used to and do things such as cooking, cleaning and laundry," and that "[h]er ability to care for her younger children is also impacted." The letter did not name Urizar-Mota's children, indicate that they were seeking damages for loss of consortium, or set forth any sum certain of damages they claimed. Likewise, though the SF-95 did note that Urizar-Mota was married, neither it nor the letter named her husband or specified any claim or sum certain of damages on his behalf.

In March 2021, HHS informed Urizar-Mota's counsel by letter that "[t]he administrative tort claim of Lucia Urizar-Mota [wa]s denied," without specifying why, and instructed that she could either file a written request for reconsideration or file suit within six months. Sergio Reyes and the couple's four children, Delmy Reyes, S.R., W.R., and G.R. (collectively, the "Reyes Plaintiffs"), did not respond to the letter in any way or take any other steps to clarify with the agency that they also intended to bring claims under the FTCA.

## B. Procedural History

In April 2021, Urizar-Mota and the Reyes Plaintiffs filed an FTCA action against the United States in the U.S. District

- 6 -

Court for the District of Rhode Island,[1] bringing claims of negligence, lack of informed consent, corporate liability, and vicarious liability. The Reyes Plaintiffs did not allege loss of consortium as a stand-alone claim; rather, as part of their negligence claim, the Reyes children alleged being "deprived of parental society and companionship of their mother" and Sergio Reyes alleged "suffer[ing] the loss of services, companionship, society and comfort of his wife."

The government moved to dismiss in part for lack of subject matter jurisdiction, arguing that the Reyes Plaintiffs failed to exhaust their administrative remedies because, unlike Urizar-Mota, they had not presented HHS with an SF-95 or other written notification of the incident accompanied by a claim for money damages in a sum certain specific to each of them. The district court denied the motion, holding that the government had sufficient notice of the Reyes Plaintiffs' loss-of-consortium claims under the First Circuit's lenient approach to FTCA presentment because those claims were "purely derivative" of Urizar-Mota's claim, which had been presented to HHS.

At bench trial, the district court heard testimony from experts regarding the PCHC providers' alleged breach of their duty

---

[1] The FTCA uses the substantive law of the state "where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Here that is Rhode Island.

of care to Urizar-Mota. Specifically, it considered testimony from Plaintiffs' expert Dr. Russell Phillips and the government's expert, Dr. Amy Ship, regarding whether a reasonable primary-care provider would have referred to a neurologist -- or ordered neuroimaging for -- a patient who exhibited headache symptoms like Urizar-Mota's.

Dr. Phillips opined that, at multiple appointments at PCHC, Urizar-Mota had presented with "red flags" that signaled her headaches may have had a secondary cause and that she should have been referred for imaging. In particular, he opined that changes in the pattern of her headaches, the possibility of trauma to her head from domestic abuse, and her neurological symptoms should have caused her primary-care providers to refer her for imaging. He further opined that the weeks-long duration of Urizar-Mota's headaches was not consistent with migraines, which typically last seventy-two hours at most, and that Urizar-Mota's providers breached the standard of care by misdiagnosing her with migraines. Moreover, he opined that the PCHC providers failed to adequately document Urizar-Mota's symptoms and health history and that this was another breach of the standard of care.

Meanwhile, the government's primary-care expert, Dr. Ship, opined that the standard of care was met at each of Urizar-Mota's appointments, nothing in Urizar-Mota's presentation warranted imaging, Urizar-Mota's symptoms were consistent with

migraines, and the nurse practitioner's documentation, while suboptimal, did not breach the standard of care. Dr. Ship, however, did agree that one of the primary care doctors' sparse documentation violated the standard of care.

The court also heard testimony regarding causation -- specifically, whether the primary-care providers' failure to refer Urizar-Mota for the imaging necessary to diagnose her tumor either (1) caused Urizar-Mota to undergo a surgery that could have been avoided altogether with earlier intervention and alternative therapies, or (2) delayed an inevitable rescission surgery such that it occurred under riskier conditions. Plaintiffs presented a neurologist, Dr. David Caplan, and neuro-oncologist, Dr. David Ashley. Both opined that the delay in diagnosis led to the tumor's growth and obstruction of fluid in Urizar-Mota's brain that caused her pre-surgery headaches and made surgery more complicated and riskier, which in turn caused Urizar-Mota to suffer permanent injuries in a surgery that does not usually cause them. Dr. Ashley further opined that alternative treatments could have addressed Urizar-Mota's tumor without surgery, though he testified that those treatments were not FDA approved until after Urizar-Mota's surgery -- and even then only for use in children -- and the studies he relied on in forming his opinion involved the pediatric setting. The government presented a neurosurgeon, Dr. Timothy Smith, who opined

that surgery to resect Urizar-Mota's tumor was inevitable, that it was not any riskier because of the delayed diagnosis, and that resecting the tumor earlier when it was smaller would have been faster but could have run the risk of injuring healthy brain tissue while trying to find the tumor.

The district court also heard fact testimony from Urizar-Mota and her eldest daughter, Delmy Reyes, regarding Urizar-Mota's provision of care for her family. Reyes testified that her mother previously took care of her, her siblings, and the household, and would bring the children to appointments and school; she further testified that, after Urizar-Mota's surgery, "[e]verything that [Urizar-Mota] used to do, she couldn't do any more," and Reyes took on those responsibilities herself. Urizar-Mota's testimony corroborated that she could not do any of the housework or cooking she did before her surgery.

After hearing from these witnesses, the district court concluded that Plaintiffs proved that PCHC's negligence caused their injuries and awarded the following damages: $662,194.62 for Urizar-Mota's post-diagnosis medical expenses; $240,800 for Urizar-Mota's pre-diagnosis pain and suffering ($100 per day); $6,387,500 for Urizar-Mota's post-diagnosis pain and suffering ($350 per day for an estimated remaining life expectancy of fifty years); $2,920,000 in homemaker loss (calculated by an assumed value of Urizar-Mota's homemaking labor of $20 an hour, applied at

- 10 -

a rate of eight hours a day, seven days a week, for Urizar-Mota's estimated remaining life expectancy of fifty years); and $3,500,000 in loss-of-consortium damages for Urizar-Mota's children, including $1,250,000 for Delmy Reyes -- who took on many household duties -- and $750,000 for each younger child. This appeal followed.

## II.

Refined to its bare essence, the government's appeal presents five main questions for us. First, did the Reyes Plaintiffs sufficiently satisfy the FTCA's administrative exhaustion requirements as to their loss-of-consortium claims, such that the court can exercise subject matter jurisdiction? Second, was the district court's award of damages for Urizar-Mota's loss as a homemaker an abuse of discretion? Third, did the district court clearly err by crediting the testimony of Urizar-Mota's primary-care expert regarding the standard of care, under which a reasonable primary-care provider would refer a patient with headaches for neuroimaging? Fourth, given the opposing testimony of the medical experts, did Urizar-Mota meet her burden to show that the government's negligence caused her injuries? Finally, was the medical expense damages award excessive? We address each of these questions in turn.

In doing so, "[w]e review the [district] court's legal conclusions supporting the dismissal de novo." Uffner v. La

- 11 -

Reunion Francaise, S.A., 244 F.3d 38, 40 (1st Cir. 2001) (emphasis omitted).  We review factual findings for clear error, which exists only where this court has the "definite and firm conviction that a mistake has been committed" after "reviewing the entire record."  Primus v. United States, 389 F.3d 231, 237 (1st Cir. 2004) (quoting García Pérez v. Santaella, M.D., 364 F.3d 348, 250 (1st Cir. 2004)) (internal quotation marks omitted).  We "must give due regard to the trial court's opportunity to judge the witnesses' credibility," Fed. R. Civ. P. 52(a)(6), but can find clear error if a finding is "based on testimony that was inherently implausible, internally inconsistent, or critically impeached," Mitchell v. United States, 141 F.3d 8, 17 (1st Cir. 1998).  We review damages awards and calculations for "abuse of discretion." Trindade v. Grove Servs., Inc., 91 F.4th 486, 493 (1st Cir. 2024).

## A.  Loss of Consortium

The first issue presented is whether the loss-of-consortium award is fatally flawed because the Reyes Plaintiffs failed to satisfy the FTCA's presentment requirement. "A key FTCA requirement is that a person cannot sue under it unless he first presents his 'claim' to the relevant administrative agency 'within two years after such claim accrues' -- failure to present a claim within that period 'forever bar[s]' the claim." Holloway v. United States, 845 F.3d 487, 489 (1st Cir. 2017) (alteration in original) (quoting 28 U.S.C. § 2401(b)); see Redondo-Borges v.

- 12 -

U.S. Dep't of Hous. & Urb. Dev., 421 F.3d 1, 7 (1st Cir. 2005); 28 U.S.C. § 2675(a). The FTCA's presentment requirement is jurisdictional and "bars claimants from bringing suit in federal court until they have exhausted their administrative remedies." McNeil v. United States, 508 U.S. 106, 113 (1993). Reviewing this legal issue de novo, we conclude that the Reyes Plaintiffs failed to present their claim and that the district court therefore lacked jurisdiction over their claims. Accordingly, we vacate the $3.5 million damages award for loss of consortium.

"For a putative plaintiff to preserve his or her legal rights in the context of the FTCA, he or she must . . . file an administrative claim indicating: '(1) sufficient information for the agency to investigate the claims, and (2) the amount of damages sought.'" Ouellette v. Beaupre, 977 F.3d 127, 141 (1st Cir. 2020) (quoting Skwira v. United States, 344 F.3d 64, 70 (1st Cir. 2003) (emphasis added)); see 28 C.F.R. § 14.2(a). As to the first requirement, the claim must "giv[e] full and specific notification of who are the claimants and the nature of the injury." Del Valle Rivera v. United States, 626 F. Supp. 347, 349 (D.P.R. 1986); see Santiago-Ramírez v. Sec'y of Dep't of Def., 984 F.2d 16, 20 (1st Cir. 1993) (FTCA presentment requirement was satisfied because the administrative claim stated "the identity" of the claimant as well as "the date of the incident, the location of the incident, the government agents involved, and the type of injury alleged"). The

claim must provide "enough information regarding the identity of the persons seeking relief [and] the underlying grounds therefore" so that the agency can be "fully aware of who were the individuals actually pursuing the claim and the nature of the total claim." Wojciechowicz v. United States, 474 F. Supp. 2d 283, 288 (D.P.R. 2007) (quoting Adames Mendez v. United States, 652 F. Supp. 356, 358 (D.P.R. 1987) (emphasis in original)). As to the second requirement, "[t]o be properly presented, the damages claim must be in a 'sum certain.'" Corte-Real v. United States, 949 F.2d 484, 485 (1st Cir. 1991) (quoting 28 C.F.R. § 14.2(a)).

Exhaustion is individual in nature; when multiple claimants are involved, each claimant must separately present his or her claims. See Lopez-De Robinson v. United States, No. 96-1702, 1997 WL 259551, at *3 (1st Cir. 1997); Dalrymple v. United States, 460 F.3d 1318, 1325 (11th Cir. 2006); Haceesa v. United States, 309 F.3d 722, 734 (10th Cir. 2002).[2] As we held in Santiago-Ramírez, proper presentment of a wife's claims does not

---

[2] The SF-95 -- the relevant claim form -- instructs that if the underlying "incident involves more than one claimant, each claimant should submit a separate claim form." Any "claim presented by an agent or legal representative must be presented in the name of the claimant," and "show the title or legal capacity of the person signing[,] and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant." Another capitalized instruction on the SF-95 provides that a claim must be "ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A **SUM CERTAIN.**"

exhaust the claims of her husband or the conjugal partnership. 984 F.2d at 20.

As the government argues, the Reyes Plaintiffs failed to exhaust their claims. Urizar-Mota's submission of an administrative claim for personal injury in her name cannot suffice. See id. The submission, which included both the SF-95 and the accompanying letter, did not name her husband or children, request a sum certain in damages for their claims, or mention a loss-of-consortium claim. "Allowing one claimant's exhaustion of her administrative remedies to satisfy the exhaustion requirement for other possible claimants" -- here, for her husband and children -- "would make it extremely difficult for the agency to know the value of the suit, thus making settlement less likely." Lopez-De Robinson, 1997 WL 259551, at *3; see McNeil, 508 U.S. at 112 n.7 (stating that the presentment requirement is designed to facilitate settlement). Because the Reyes Plaintiffs did not avail themselves of the FTCA's limited waiver of sovereign immunity -- which we must construe strictly in the government's favor, see In re Rivera Torres, 432 F.3d 20, 23-24 (1st Cir. 2005) -- by filing a claim form, their claims are barred.

We acknowledge, as the Reyes Plaintiffs note, that we have treated the FTCA presentment requirement somewhat leniently, recognizing that the law "was not intended to put up a barrier of technicalities" to defeat claims. Holloway, 845 F.3d at 490

- 15 -

(quoting Santiago-Ramirez, 984 F.2d at 19). Lenience has its limits, however, and does not vitiate the minimum requirement that administrative claims identify both the claimants and the nature of the injury, as well as the amount of damages sought. See Corte-Real, 949 F.2d at 486 (explaining that "adherence to the sum certain requirement" is an "absolute necessity"). Because the only administrative claim made in this case -- that of Urizar-Mota -- did not identify the Reyes Plaintiffs, HHS had no notice of the identity of any claimants other than Urizar-Mota. Further, the request for a lump sum of damages by itself did not provide adequate notice of any other claimants' potential claims. HHS "cannot assess realistically the scope of its liability if it lacks notice that the sum certain listed on a claim represents the damages asserted by multiple claimants and cannot discern the relative size of each person's claim for damages." Burke v. Veolia Energy Co., No. 16-cv-5559, 2017 WL 432536, at *4 (E.D. Pa. Feb. 1, 2017); see Dondero v. United States, 775 F. Supp. 144, 150 (D. Del. 1991) ("It is unreasonable to require the Federal agency to presume that multiple claims exist merely because they believe the request to be excessive.").[3]

---

[3] Where courts in our circuit have shown leniency, such as by treating a single claim form as sufficient for two claimants, the claimants have consistently offered more information than the Reyes Plaintiffs did here. See, e.g., Casey v. United States, 635 F. Supp. 221, 225-26 (D. Mass. 1986) (administrative claim was sufficient where wife "was listed by her husband on the

Our conclusion is not altered because the Reyes Plaintiffs' loss-of-consortium claims are derivative of Urizar-Mota's claims under Rhode Island law. The Rhode Island Supreme Court has clarified that while loss of consortium is a "derivative" claim under Rhode Island law in the sense that it is "inextricably linked to the injured spouse's [or parent's] action," it remains an "entirely unique cause of action under the law," such that "the assertion of one spouse's right . . . within the statutory period of limitations will not excuse the failure of

administrative claim form"); Hardiman v. United States, 752 F. Supp. 52, 53-54 (D.N.H. 1989) (government was on notice of wife's loss-of-consortium claim where wife was "specifically identified as a claimant on the form"). Conversely, courts in our circuit regularly dismiss cases where these minimum requirements were not satisfied. See, e.g., Hornof v. United States, No. 2:19-CV-00198-JDL, 2021 WL 1651193, at *2-4 (D. Me. Apr. 27, 2021) (holding that wife's "failure to independently satisfy the administrative exhaustion requirement deprived the government of its opportunity to investigate and attempt to settle her claims," even though husband's claim "identified him as being married and recounted that his wife was distressed as a result of his detention," because wife "was not identified by her actual name nor were there any claims for damages on her behalf"); Davis v. United States, 834 F. Supp. 517, 518-19 (D. Mass. 1993) (dismissing for lack of subject matter jurisdiction where only wife "was listed as a claimant on Form 95 and no mention was made of a claim by her husband for loss of consortium," and no value was attached to such a claim). Moreover, Urizar-Mota had the assistance of counsel when filing her claim, and this weighs against leniency. Where a plaintiff "counselled by her attorney[] certainly had the capacity to state her claim explicitly" but filed a claim with procedural defects, the plaintiff's having "act[ed] pursuant to the advice of counsel . . . tip[s] the scales against a ruling that the claim asserted . . . surmounts the jurisdictional hurdle." Wozniak v. United States, 701 F. Supp. 259, 263 (D. Mass. 1988); see also Dondero, 775 F. Supp. at 149.

the other spouse to assert within the statute of limitations his or her own separate right." Desjarlais v. USAA Ins. Co., 824 A.2d 1272, 1277 (R.I. 2003) (quoting Normandin v. Levine, 621 A.2d 713, 716 (R.I. 1993)). This logic extends to presentment, as the government contends: just because their claims are derivative of Urizar-Mota's claims -- and thus would necessarily fail if Urizar-Mota's claims failed -- does not mean that the Reyes Plaintiffs did not need to comply with the FTCA's presentment requirements in order to "assert . . . [their] own separate right[s]." Id.; see Normandin, 621 A.2d at 716.

Accordingly, Urizar-Mota's "individual administrative claim is not sufficient under the FTCA to serve as notice to the government of potential loss-of-consortium claims by other family members that could be derived from [her] claim." Aziz ex rel. Azizi v. United States, 338 F. Supp. 2d 1057, 1061 (D. Neb. 2004).[4]

---

[4] Our conclusion is consistent with abundant persuasive guidance from federal courts around the country standing for the proposition that "the merits of [a] loss of consortium claim [being] derivative of the merits of [another claimant's] claim [does] not relieve [a plaintiff] of the responsibility to assert her own claim." Barber v. Kone, Inc., 118 Fed. App'x 276, 278 (9th Cir. 2004); see, e.g., Clayton v. United States, 913 F. Supp. 2d 80, 86 (D.N.J. 2012) (holding that plaintiff's claims, though "derivative from claims of [her] injured spouse . . . still need[ed] to be filed separately with the agency" and the plaintiff's failure to file "in her individual capacity" required the dismissal of "all claims seeking relief for her individual capacity" (quoting Lay v. United States, 3:10-CV-2623, 2011 WL 1655824, *4 (M.D. Pa. May 2, 2011)); Wisner v. United States, 154 F.R.D. 39, 43 (N.D.N.Y. 1994) (dismissing "derivative claim" where plaintiff failed "to file an administrative claim or to place the

The "derivative nature" of the Reyes Plaintiffs' claims "does not excuse [their] failure to comply with the FTCA exhaustion requirements." Brokaw v. United States, No. CV13-1726PHXDGC, 2014 WL 345668, at *1 (D. Ariz. Jan. 30, 2014).

## B.   Homemaker Damages

The second issue presented is whether Urizar-Mota is entitled to an award of damages for her loss as a homemaker. Although Urizar-Mota, as the government notes, never specifically requested damages in any filing for her loss as a homemaker under Rhode Island law, the district court awarded her $2.92 million in damages to make up for the "economic loss to her" due to her inability to perform homemaking duties.  We review this damages award for abuse of discretion, meaning the government "must convince [us] that the district court 'committed a meaningful error in judgment'" before we will vacate the award.  Rojas-Buscaglia v. Taburno-Vasarhelyi, 897 F.3d 15, 24 (1st Cir. 2018) (quoting Lussier v. Runyon, 50 F.3d 1103, 1111 (1st Cir. 1995)).  Such an error of judgment occurs, and our court may "override a damage determination," when the award is "unsupported by the evidence, grossly excessive, or shocking to the conscience."  McKinnon v.

United States on notice of the amount of his claim"); Ferguson v. United States, 793 F. Supp. 107, 110 (E.D. Pa. 1992) (holding that a wife's failure to pursue her administrative remedies before filing suit deprived court of jurisdiction even though her loss-of-consortium claim was "wholly derivative of her spouse's claim" and her husband had filed an administrative claim).

Kwong Wah Rest., 83 F.3d 498, 506 (1st Cir. 1996). We conclude that the district court's award of homemaker damages was premised on a meaningful error.

### 1. Meaningful Error

Under Rhode Island law, "[i]n any suit for damages as a result of personal injuries, a homemaker may recover the fair value of homemaker services provided to the home and those living therein." R.I. Gen. Laws § 9-1-47. Despite the paucity of case law interpreting and applying Section 9-1-47,[5] we can resolve the dispute over the propriety of the district court's award of homemaker damages by looking "to the unambiguous text of the statute, giving effect to its plain meaning." United Food & Com. Workers Union, Loc. 328, AFL-CIO v. Almac's Inc., 90 F.3d 1, 5 (1st Cir. 1996). The plain language of Section 9-1-47 requires us to vacate the district court's homemaker damages award as both unsupported by the evidence and grossly excessive.

---

[5] The parties do not present us with, nor are we aware of any, cases from Rhode Island or elsewhere offering guidance on how to calculate homemaker damages under Section 9-1-47, or the type of evidence a plaintiff must present to recover such damages. So we must make our best prediction about how the Rhode Island Supreme Court would rule if faced with these issues, see Power Rental Op Co., LLC v. Virgin Islands Water & Power Auth., 142 F.4th 17, 22 (1st Cir. 2025), knowing that if our prediction is wrong, a Rhode Island court can ignore what we have written because state courts are not bound by our view of state law, see Mass. Delivery Ass'n v. Coakley, 671 F.3d 33, 47 (1st Cir. 2012).

As set forth in the statute, a person may only "recover the fair value of homemaker services provided to the home and those living therein." R.I. Gen. Laws § 9-1-47 (emphasis added). Thus, any award under the statute must reflect a reasonable estimate of the services that would have been provided by the homemaker over time, absent personal injury. Section 9-1-47 defines a "homemaker" as "a person who has primary responsibility for the care of a home and a family" without receiving "direct monetary compensation" in return. Id. (emphases added). Under this definition, "homemaker services" are not necessarily provided in perpetuity, because homemaker status is not immutable. Rather, it is a status contingent on both (1) the individual's continuing to have "primary responsibility" for a home and a family, and (2) the existence of both a "home and a family" that is "living therein" for which to care. Id. A commonsense interpretation of the statute suggests that multiple variables -- like whether and when children become independent and move out of the home, the division of labor once children leave the home, and the likely retirement age and life expectancy of a homemaker's spouse (if any) -- may impact the amount and duration of the homemaker services that the injured person would have provided absent injury.[6]

---

[6] Without attempting to cover all possibilities, we offer some examples. If a homemaking mother's children move out of her home

- 21 -

The district court ignored the plain meaning of the statute when it awarded damages based on an assumption, unsupported by evidence, that -- absent her permanent injuries -- Urizar-Mota would have continued to provide "homemaker services" under the statute for the entirety of her remaining fifty-year life expectancy at a consistent number of hours each day.[7] To

at age eighteen, the mother likely ceases to have "primary responsibility" for their care. The situation would be different if, for example, one of her children experiences a serious health condition and can be expected to remain at home long term. Once children leave the home, a person may remain a homemaker if she still has primary responsibility for the care of the home and of her spouse -- albeit while perhaps (and presumably) spending fewer hours providing homemaker services than she did when the children lived with her. However, if her spouse retires and takes on more household duties, she may lose her homemaker status by shifting from "primary responsibility for the care of a home" to equal or secondary responsibility. R.I. Gen. Laws § 9-1-47. If her spouse dies, and she lives alone, then even if she continues to shoulder primary responsibility for the care of her home, she would likely no longer provide any homemaker services, as she lacks primary responsibility for the care of a family "living therein." Id. Conversely, a homemaker and her spouse may grow old together, and in her advanced years the homemaker may no longer possess the strength and dexterity to maintain the home and may hire help or even move to an assisted living facility. In this scenario, she would no longer have "primary responsibility for the care of a home," id., and so she would not qualify as a homemaker.

[7] Whether Urizar-Mota had a remaining life expectancy of 50 years is in dispute: Plaintiffs stated in their proposed findings of fact that her life expectancy was another 42.6 years, to age 79, and as the government points out on appeal, the National Vital Statistics Reports table in the trial record offered average life expectancies for Hispanic females aged 35 and 40 in 2020 of 47.4 years and 42.6 years, respectively. The court's use of the table to reach an estimate of 50 years was not an abuse of discretion, however, because for the first half of 2020 -- the year on which the statistical table is based -- Urizar-Mota was 33 years old (as her medical records indicate she was born in July 1986). It was therefore appropriate for the court to approximate a life

- 22 -

accurately determine the number of years for which Urizar-Mota would have maintained "primary responsibility" for the care of a home and family living therein, and the hours per day she would have spent over those years providing services, the district court needed to consider at least the following factors: (1) when Urizar-Mota's children were likely to become independent, and/or move out of the house; (2) the amount of homemaker services she would continue to provide thereafter, such as for her husband; and (3) the number of years for which she would likely be physically and mentally able to continue taking primary responsibility for household tasks and family care (which may be shorter than her total life expectancy). We do not suggest that Urizar-Mota needed to prove these with exactitude; rather, the determinative question in this case is whether she provided sufficient evidence on these irreducible statutory requirements. The record indicates that she did not.

---

expectancy between the estimates in the table for Hispanic females aged 30 in 2020 (52.5 years) and aged 35 in 2020 (47.4 years). The fifty-year estimate falls neatly in this range. Moreover, the court explained it was estimating Urizar-Mota's life expectancy "from the date she was finally diagnosed (June 19, 2019)" and determined it to be "about 50 years." At the time of her diagnosis, in 2019, Urizar-Mota was 32, so again, the court's estimating a life expectancy between that of a 30-year-old and 35-year-old average Hispanic female in the year 2020, just a few months after her diagnosis, made sense. We therefore conclude that the court's estimate of Urizar-Mota's life expectancy had adequate evidentiary support.

The facts to which Urizar-Mota and her daughter did testify were limited and suggest that Urizar-Mota's homemaker services consisted in large part of childcare, including making meals for her children and driving them to school and activities,[8] which Urizar-Mota would likely not have continued to provide into her eighties (absent some extraordinary circumstances). At the time Urizar-Mota became permanently injured, her children were ages four, nine, eleven, and seventeen (and no party points to evidence suggesting that she is the parent of a special-needs child). Thus, the time horizon during which Urizar-Mota would have continued to drive her children to school, soccer practice, and other activities absent her injuries would likely have been closer to fourteen years (i.e., until her youngest turned eighteen) than fifty years. The district court, however, assumed (with no evidentiary basis) that Urizar-Mota would provide these services consistently for her full lifetime. As the government asserts, by failing to consider that her hours spent caring for her family would have decreased when her children moved out of her home -- likely long before the end of Urizar-Mota's life -- and

---

[8] We do not intimate even the faintest suggestion that these activities capture the entire universe of homemaker services. Section 9-1-47 does not define "homemaker services," so other activities performed to care for a home or family may well be encompassed by that phrase -- for example, managing household finances or making in-home repairs. Our analysis, which focuses on the testimony presented in this case, does not limit the types of homemaker services other litigants could seek to prove.

that she might then have lacked primary responsibility for the care of a family and home depending on the division of responsibilities (if any) with her spouse and/or her age and health, the district court produced a grossly excessive damages award, unsupported by the limited evidence Urizar-Mota provided. Accordingly, we vacate the homeowner damages award.

### 2.  Vacatur and Remand

Our analysis, however, cannot end here because we both affirm the district court's determination that PCHC acted negligently and thereby harmed Urizar-Mota, see infra Part II.C–D, and conclude that the facts in the record may be sufficient to support awarding some amount of homemaker damages to Urizar-Mota if she has not waived her right to recover.  We accordingly remand to the district court with instructions to first determine whether, as the government argues, Urizar-Mota waived the right to recover homemaker damages and, if not, to recalculate those damages consistent with this opinion.

Remanding the homemaker damages determination to the district court is appropriate here because the record indicates that, though the court meaningfully erred in calculating homemaker damages, Urizar-Mota may still be entitled to some award.  The record indicates that before her permanent injury, Urizar-Mota had provided homemaker services because she exercised "primary responsibility for the care of a home and a family" that was

"living therein." R.I. Gen. Laws § 9-1-47. As already noted, Urizar-Mota introduced evidence that she previously took care of her children and the household, did all the cooking and cleaning, and drove her children to and from school and appointments, and that due to her injuries, she can no longer perform these services. Accordingly, evidence present in the record would allow the district court to make some award of damages consistent with this opinion. We leave it to the discretion of the trial court to determine the propriety of holding additional proceedings to hear further evidence regarding the amount of homemaker damages.

Before doing so, however, the district court should determine whether Urizar-Mota waived her right to recover homemaker damages under Section 9-1-47. The government argues that Urizar-Mota expressly waived any right to recover homemaker damages by (1) not claiming them in her interrogatory responses or pre-trial memorandum, (2) indicating in pretrial correspondence that the only economic damages she sought were medical expenses, and (3) disclaiming "loss of earning capacity" damages and indicating that her only economic damages were medical expenses in her proposed findings of fact.[9] Plaintiffs are generally "bound

---

[9] The government also argues that Urizar-Mota waived any right to recover for loss as a homemaker by failing to either allege such loss in her complaint, expressly ask for homemaker damages in her prayer for relief, or otherwise invoke R.I. Gen. Laws § 9-1-47 before the district court. This is not necessarily fatal. Federal Rule of Civil Procedure 54(c) authorizes federal courts to

- 26 -

by the consequences of [their] litigation strategy." <u>Trans-Spec Truck Serv., Inc.</u> v. <u>Caterpillar Inc.</u>, 524 F.3d 315, 327 (1st Cir. 2008). Whether Urizar-Mota's statements during litigation constituted waivers of her right to recover homemaker damages may depend on the proper classification of damages under Section 9-1-47. Given that Urizar-Mota most clearly disclaimed additional categories of "economic damages," it may be necessary for the district court to determine whether homemaker damages under Section 9-1-47 are economic or non-economic in nature. Because no authoritative Rhode Island case law characterizes damages under Section 9-1-47 as economic or noneconomic, this issue should be addressed by the district court following briefing by the parties rather than by this Court in the first instance.[10] We leave it to

---

"grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). We have also noted, however, that "there may be cases where the failure to ask for particular relief so prejudiced the opposing party that it would be unjust to grant such relief" as a matter of law. <u>United States</u> v. <u>Marin</u>, 651 F.2d 24, 31 (1st Cir. 1981). We do not find prejudice in this case simply because homemaker damages were not specifically requested in the complaint. The potential for homemaker damages was identified in Urizar-Mota's administrative claim as well as the complaint. Prejudice might arise, however, if Urizar-Mota expressly disavowed homemaker damages. <u>See</u> <u>Seven Words LLC</u> v. <u>Network Sols.</u>, 260 F.3d 1089, 1096 (9th Cir. 2001). Accordingly, the question whether Urizar-Mota expressly waived her right to such relief may be determinative in this case.

[10] We also note that whether damages under Section 9-1-47 are economic or noneconomic affects not only whether Urizar-Mota waived her right to recover them through her representations regarding economic damages, but also the nature of the evidentiary support necessary to calculate them. To the extent they are

the district court's discretion whether to certify this question to the Rhode Island Supreme Court, given the lack of precedent on this issue. See generally Arizonans for Off. Eng. v. Arizona, 520 U.S. 43, 76 (1997); McMillan v. Amazon.com, 983 F.3d 194, 202 (5th Cir. 2020).

## C. Pain and Suffering Damages

The government also challenges the district court's pain and suffering awards. For the reasons explained below, we uphold the district court's determination that PCHC breached the standard of care by delaying the imaging, diagnosis, and rescission of Urizar-Mota's brain tumor and thereby caused her permanent injuries. We also conclude that the amount of the awards -- $100 per day for Urizar-Mota's persistent, debilitating headaches pre-diagnosis, and $350 per day for the remainder of her life expectancy to account for loss of enjoyment of life, lost mobility, and depression -- is not grossly excessive nor shocking to the conscience. We detect no abuse of discretion on the part of the district court, see generally McKinnon, 83 F.3d at 506, and therefore affirm.

---

noneconomic, the district court may have more leeway to rely on the "exercise of [its] judgment and an application of [its] experience in the affairs of life and [its] own knowledge of social and economic matters." Bruno v. Caianiello, 404 A.2d 62, 65 (R.I. 1979).

- 28 -

### 1. Standard of Care

To address the government's arguments, we must first determine whether the district court erred by crediting the testimony of Plaintiffs' primary-care expert, Dr. Phillips, regarding the applicable standard of care. The government takes issue with Dr. Phillips's testimony at trial that any single "red flag" requires referring a patient for neuroimaging and argues that this testimony is inconsistent with the medical literature and with his own deposition testimony. Having reviewed the full record, we conclude that the district court did not err in crediting Dr. Phillips's testimony because his testimony was largely consistent, plausible in light of the medical literature introduced by the parties, and not critically impeached. We further conclude that any error in crediting the specific portion of Dr. Phillips's testimony about single red flags necessitating imaging was harmless, because the district court based its ultimate finding of breach on the broader pattern of <u>multiple</u> red flags across <u>multiple</u> medical appointments, as well as on separate testimony by Dr. Phillips regarding separate and sufficient breaches of the standard of care -- namely, the inadequacy of the PCHC providers' medical documentation and their misdiagnosis of Urizar-Mota with migraines.

What the standard of care requires in a particular medical malpractice case, and whether that standard of care has

been breached, are questions of fact that ordinarily require expert testimony to resolve. Dunning v. Kerzner, 910 F.2d 1009, 1014 (1st Cir. 1990) (applying Rhode Island law). Therefore, we review the district court's determinations at bench trial regarding the standard of care "for clear error," affording them "considerable deference." N. Ins. Co. of N.Y. v. Point Judith Marina, LLC, 579 F.3d 61, 67 (1st Cir. 2009) (quoting Jackson v. United States, 156 F.3d 230, 232 (1st Cir. 1998)). We find such error where a determination is "based on testimony that was inherently implausible, internally inconsistent, or critically impeached," Sánchez v. United States, 133 F. App'x 747, 751 (1st Cir. 2005) (quoting Mitchell, 141 F.3d at 17), leaving this court with "the definite and firm conviction that a mistake has been made," In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 181–84 (1st Cir. 2009) (quoting Mitchell, 141 F.3d at 17).

Our court generally defers to a district court's better vantage point for, and expertise in, assessing expert witnesses' credibility. Since they "are inherently fact-based," credibility determinations "are peculiarly within the competence of the district court." United States v. Rasberry, 882 F.3d 241, 246 (1st Cir. 2018). When a judge's factual "finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not

internally inconsistent, can virtually never be clear error." Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985); United States v. Jordan, 813 F.3d 442, 447 (1st Cir. 2016). This makes sense given that "only the trial judge can be aware of the variations in demeanor and tone of voice" of a witness. Anderson, 470 U.S. at 575. Applying this standard, we see no reversible error.

### a.    Plausibility

Dr. Phillips testified that headaches fall into two categories: (1) primary, which consist of migraine, cluster, and tension headaches, and (2) secondary, which include non-benign causes of headaches, such as trauma and brain tumors. He testified that to determine whether a patient has a primary or secondary headache, a primary-care provider must take a detailed history from the patient and create a differential diagnosis, listing the possible causes of the patient's headaches and accompanying signs and symptoms. He testified that the standard of care requires a primary-care provider to document the detailed history in the patient's medical record, and that this history allows the provider to evaluate whether the patient's headache requires neuroimaging by looking for "red flags" -- signs or symptoms associated with a secondary headache. These "red flags," summarized in peer-reviewed medical literature that Dr. Phillips discussed, include in relevant part: pattern change or recent onset of new

headache, neurological deficit, progressive headache and atypical presentations, and posttraumatic onset of headache. Dr. Phillips testified that the standard of care requires a primary-care provider to order neuroimaging of a patient if the patient exhibits any "red flags." Dr. Phillips linked the information in Urizar-Mota's medical records to various flags, including pattern change, posttraumatic onset, and neurological deficit.

Dr. Phillips's testimony regarding red flags is not inherently implausible: rather, it has a basis in the medical literature and in Dr. Phillips's extensive experience. [11] Dr. Phillips's observations about breaches of the standard of care mapped onto the "red flags" framework outlined in peer-reviewed medical literature. The government suggests that Dr. Phillips's testimony is inconsistent with the medical literature, but Dr. Phillips provided reasonable explanations for his minor departures from the literature. For example, he indicated that Urizar-Mota's vomiting raised concern for him; while this is not a "red flag" listed in the medical literature, he explained at trial that such literature "list[s] some," -- not necessarily all -- "of those things that are red flags" and that red flags are

---

[11] At the time he testified, Dr. Phillips had been a primary-care physician at Beth Israel Deaconess Medical Center for forty-seven years and served as chief of the primary care division for ten years. He also directed the Center for Primary Care at Harvard Medical School, where he served as a professor of medicine.

"just part of what we learn in medical school or nursing school," -- suggesting that his concern regarding vomiting was based on his education and experience. He also testified that "headaches that just don't fit with any sort of migraine or any of the usual sort of primary headaches" could prompt a reasonably competent primary-care provider to consider imaging. While the relevant medical literature does not compel this conclusion, it does not foreclose it either. The "Red and Orange Flags for Secondary Headaches in Clinical Practice" article cited by the parties frames the choice to refer for imaging as discretionary, but Dr. Phillips reasonably clarified that "[h]aving something be discretionary doesn't necessarily mean that it is not part of standard care."

Dr. Phillips also effectively distinguished the government's literature. He pointed out that he "would not consider" the "Choosing Wisely" article relied upon by the government to be a "clinical guideline," as it deals with "population data across everyone," that "has nothing to do with the patients . . . who have chronic headaches," or are "in an abusive relationship" like Urizar-Mota. He distinguished the government's "Evidence-Based Guidelines in the Primary Care Setting" article as being "industry-funded . . . primarily by pharma companies . . . which is not typical of

how . . . peer-reviewed and evidence-based . . . guidelines are developed."

While the government's primary-care expert, Dr. Ship, felt that imaging was not required, this does not make Dr. Phillips's opposing opinion, which has a basis in the record and medical literature, inherently implausible; rather, this is a classic example of dueling experts. When multiple experts testify "in a diametrically opposite vein, choosing between experts in a jury-waived trial is principally the business of the district court, not the court of appeals," and this court will "decline . . . to second-guess the trial court's scorecard in respect to dueling experts." Texaco P.R., Inc. v. Dep't of Consumer Affs., 60 F.3d 867, 878 (1st Cir. 1995).

Further, the record does not support the government's contention that Dr. Phillips's testimony was inconsistent or otherwise impeached. To the extent Dr. Phillips's testimony at deposition and at trial differed, the differences can be attributed to the context of counsel's questions rather than the content of his answers. As he explained at trial, Dr. Phillips interpreted counsel's questions during his deposition as "really specific to" individual "visit[s]," rather than "in the broader context" of Urizar-Mota's health history. By contrast, at trial, he tailored his answers to Urizar-Mota's situation. Further, when the government tried to impeach him with his deposition testimony

regarding neurological findings, he explained that in his deposition, he was "being asked about hypothetical patients that aren't related to this case." We find these explanations satisfactory and discern no clear error on the part of the district court.

### b. Harmless Error

Even assuming, as the government contends, that it was error for the court to credit Dr. Phillips's testimony about individual appointments or any single red flag supporting a referral for imaging, this error was harmless for at least two reasons.

First, the district court did not base its finding that the government breached the standard of care solely on any individual appointment or red flag: rather, the court's conclusion rested on a record showing "several" red flags over the course of "many visits to the PCHC medical providers." There were, in short, multiple missed opportunities where Urizar-Mota's symptoms signaled intracranial pathology or, at the very least, a secondary cause for her headaches. And "there is no indication that [Dr. Phillips's] expert testimony . . . was the sole basis for the district court's finding" that multiple red flags over multiple appointments required imaging, because the district court had access to Urizar-Mota's entire medical record and the "Red and Orange Flags" literature, which together "contain[] substantial

evidence supporting the finding." <u>See</u> <u>United States</u> v. <u>Carvajal</u>, 85 F.4th 602, 612 (1st Cir. 2023).

Second, the court based its finding of breach on two other, sufficient breaches of the standard of care, separate from the red flags analysis: (1) insufficient documentation, and (2) misdiagnosis with migraines. The court explained that the nurse practitioner's record-keeping about Urizar-Mota's symptoms fell short of what the "standard of care required," and Dr. Harris's diagnosing Urizar-Mota with migraines "despite the absence of information necessary to support the diagnosis documented in her medical records" also "violated the standard of care." Neither of these findings depend on Dr. Phillips's contested testimony about red flags.

Dr. Phillips's testimony about insufficient documentation was plausible, consistent, and not impeached. He opined that "documentation is incredibly important," the "the standard of care" "absolutely" "requires reasonably competent primary care practitioners to document . . . the history, the physical exam findings, neurological exam findings, assessment, [and] plan, in the patient's medical record," and the PCHC nurse practitioner breached this standard of care by not documenting whether Urizar-Mota had "ever had any headache like this before, [and] whether there's . . . been any trauma to her head," despite knowing that she suffered domestic abuse. He testified that

"there is a complete failure throughout her record . . . in actually even characterizing the headache fully," and noted that one of Urizar-Mota's providers, Dr. Harris, "fell below the standard of care" when he "didn't document what he said he would do." He testified that another of her providers, Dr. Thomas, violated the standard of care when he did not review Urizar-Mota's medical history of headaches, and did not elicit the history from the patient or describe the headache sufficiently in documentation. Other witnesses' testimony corroborates this. Dr. Harris testified that the standard of care was to "document information that [he] consider[ed] to be important and germane to the care . . . and treatment of [a] patient" "[t]o the extent practical," but went on to admit he did not record several relevant details about Urizar-Mota, such as possible caffeine withdrawal or sleep apnea.[12] Together, this testimony provided a solid basis for the court's finding that documentation issues breached the standard of care and caused Urizar-Mota's injury by preventing her symptoms from being put "in context of what had been happening over time," which would have helped practitioners to "recogniz[e] that this patient required imaging."

---

[12] Even the government's expert, Dr. Ship, stated that the nurse practitioner's documentation was "suboptimal" and that one of the primary-care doctors' documentation "would be improved by a whole lot more information" and did "violate the standard of care."

Similarly, Dr. Phillips's testimony about misdiagnosis is plausible, consistent, and not impeached.  He testified that it was a "violation of the standard of care" to "come to a diagnosis" of migraines that "doesn't match the history that's being provided."  He testified that there was no information to support the diagnosis of migraines.  He reiterated that there was "no clear basis for [the migraine] diagnosis" at any point.  The government argues that Dr. Phillips contradicted himself by indicating during his deposition that in one appointment, Urizar-Mota's headache presented as a migraine, but a close read of his deposition testimony shows that even then, he expressed some doubt that Urizar-Mota actually experienced a migraine because "you don't start having migraines out of the blue," and so this indicated a pattern change -- one of the "red flags" that necessitates imaging.  Even accepting that Dr. Phillips contradicted himself on this issue, the court could still have found that Urizar-Mota's symptoms were not consistent with migraines based on the medical records and the medical literature that the government offered, the latter of which describes migraine symptoms (such as pulsating, lasting between four and seventy-two hours, and unilateral pain) that do not match up with Urizar-Mota's complaints as documented in her medical records.

Because the court found multiple, sufficient breaches of the standard of care, any error in crediting Dr. Phillips's opinion

that "any" red flag necessitates imaging was harmless.  We uphold the district court's finding that PCHC breached its duty of care.

## 2. Causation

We turn then to causation.  The district court found that PCHC's negligence caused Urizar-Mota's injuries in two ways: first, it required Urizar-Mota to undergo surgery that she could have avoided with alternative therapies if her tumor had been detected and diagnosed sooner, and second, the delay in her surgery resulted in complications and permanent injuries that would not have occurred during and after the tumor resection surgery if it had been performed earlier.  On appeal, the government challenges both findings, maintaining that surgery was inevitable and that the delay in surgery did not cause Urizar-Mota's complications.

We review the district court's findings for clear error because "whether proximate cause exists" is a "question[] for the factfinder," Fed. Express Corp. v. State of R.I., Dep't of Transp., Airports Div., 664 F.2d 830, 835 (1st Cir. 1981) (discussing Rhode Island law), and "[w]here, as here, the district court conducts a bench trial and serves as the factfinder, its determinations of negligence, proximate cause, and similar issues are entitled to considerable deference," N. Ins. Co., 579 F.3d at 67 (quoting Jackson, 156 F.3d at 232).  Under that standard, we will set aside the trial court's findings "only if, after careful evaluation of the evidence, we are left with an abiding conviction

that those determinations and findings are simply wrong." Id. (quoting Jackson, 156 F.3d at 232-33). We conclude that the finding of causation was error to the extent the district court found surgery to be avoidable, but that this error was harmless because the delay in imaging, diagnosing, and resecting Urizar-Mota's tumor was a second, sufficient cause of Urizar-Mota's injuries.

### a. Avoidability

The court's finding that surgery could have been avoided altogether, though grounded in expert testimony by Plaintiffs' expert, Dr. Ashley, is clearly erroneous because that testimony was critically impeached: Dr. Ashley admitted at trial that the drugs were not FDA-approved until either 2020 or 2021 -- after Urizar-Mota's surgery in 2019 -- and even then only for children; to date, the treatments are "still not approved for adult pilocytic astrocytoma." It is possible that Urizar-Mota could have joined a clinical trial even before FDA approval, and Dr. Ashley mentioned that he "was able to access those drugs for adult patients through compassionate release directly with the pharmaceutical company." This, however, is not enough. Dr. Ashley did not specify when he was able to access those drugs for adults, nor indicate that he was always able to access those drugs or had any guarantee the pharmaceutical company would have provided them for Urizar-Mota, nor point to any studies showing the efficacy of those drugs in

adults; instead, he relied on "studies in the pediatric setting" and assumed that adult tumors would respond in the same way to the drugs. It is not clear that the drugs would have obviated the need for surgery: while Dr. Ashley observed that the behavior of pilocytic astrocytomas in adults "in clinical terms, is the same as pilocytic astrocytoma in children," this does not necessarily mean that children and adults' responses to the therapies would be the same. Accordingly, Urizar-Mota failed to meet her burden of persuasion to show that, more likely than not, she could have accessed the drugs before the date of her surgery and they would have been effective enough for her to make surgery unnecessary.

In any event, this error was harmless. Justice does not require vacating or modifying the judgment, see Fed. R. Civ. P. 61, because (1) Plaintiffs sufficiently proved causation on an alternative theory (i.e., negligent delay in imaging and diagnosis caused Urizar-Mota to undergo a belated surgery with higher-than-normal risks), as described below; (2) Plaintiffs had already stipulated to deducting the surgery-related medical expenses as inevitable, so the damages award need not change; and (3) the court apparently did not consider pain or suffering associated with surgery itself in its calculation of the pain and suffering award. Thus, "it is highly probable that the error did not affect the outcome of the case," Harrison v. Sears, Roebuck & Co., 981 F.2d 25, 29 (1st Cir. 1992), and it did not "affect any

- 41 -

party's substantial rights," Fed. R. Civ. P. 61.  Indeed, counsel for the government agreed at oral argument that the delay of the imaging, diagnosis, and surgery was a second ground on which to find causation, and the government has not argued that the delayed diagnosis is not a sufficient cause of Urizar-Mota's injuries, standing alone.

### b.   Delay

The court did not clearly err in finding that the delay in imaging and diagnosis increased the risk of Urizar-Mota's surgery, because it based this finding on the "coherent and facially plausible opinion[s]" of Plaintiffs' experts, Dr. Caplan and Dr. Ashley.  Jordan, 813 F.3d at 447.  The record indicates that as a neurologist and neuro-oncologist, Dr. Caplan and Dr. Ashley help evaluate risks of treatment for their patients, and so "it is not reversible error that the district court was more persuaded by the" opinions offered by Plaintiffs' experts "than the other way around."  La Esperanza de P.R., Inc. v. Perez y Cia. de P.R., Inc., 124 F.3d 10, 21 (1st Cir. 1997).  While they do not share Dr. Smith's specialized knowledge of surgery, the fact that Dr. Ashley and Dr. Caplan are "not . . . specialist[s] in the field in which [they are] giving [their] opinion[s] affects not the admissibility of [their] opinion[s] but the weight the [factfinder] may place" on them.  Mitchell, 141 F.3d at 15. Though Dr. Smith's testimony regarding surgical risk is in sharp

conflict to Dr. Ashley and Dr. Caplan's, "an appellate court must defer in large measure to the trial court's superior point of vantage." Jordan, 813 F.3d at 447. The "district court's choice between two interpretations of the significance of" the delay in surgery, "both with record support, cannot be clear error." Sánchez, 133 F. App'x at 753.

It was reasonable, based on Dr. Ashley and Dr. Caplan's testimony, for the court to conclude that earlier diagnosis would have allowed for "multidisciplinary board review and evaluation of . . . her tumor to decide the safest treatment plan," and earlier surgery would have been "very unlikely to cause any major complications or surgical morbidity to the patient." Dr. Caplan testified that Urizar-Mota's tumor "would've been radiologically visible going back at least a decade"; that her pre-surgical pain and suffering from headaches were caused by "increased intracranial pressure" that was in turn "[c]aused by this tumor affecting the flow of cerebrospinal fluid"; that her surgery "[wa]s a more difficult operation with a higher risk of complications because of the conditions," particularly because the "blood in the fourth ventricle" increased the "possibility for vasospasm and a subsequent vascular event like a stroke"; and that "the presence

of blood" from the tumor "raise[d] risks for other non-vasospastic related surgical complications."[13]

Dr. Ashley, meanwhile, described how by the time of surgery, Urizar-Mota "already had a bleed, and she already had pre-existing injury to the brain," "the tumor was a relatively large size," and "all of these things ma[d]e it less than an ideal surgical consideration."  He opined that Urizar-Mota's permanent disabling injuries "would not have occurred from the surgery" if the surgery had been performed "anytime from November of 2012 up until the end of 2018."  He further stated that "the patient's less-than-ideal condition and large tumor at the time of surgery," as well as her "hemorrhage in the operative field" and "swelling and edema that probably wasn't completely resolved at the time of surgery," "would've contributed to a difficult neurosurgical case and would've contributed to the injuries that she . . . had."  He also expressed the view that those conditions "would not have existed" from 2012 to 2018 because "[t]he tumor would've been smaller, there would be no hemorrhage, there would be no swollen

---

[13] One could read the government's briefs to suggest it was clear error for the court to find that "there would not have been any blood or byproducts of blood in the surgical field" if Urizar-Mota's tumor had been resected earlier.  But even assuming error, the same was harmless as it relates to a minor detail in the court's thorough evaluation of the increased risks associated with delayed surgery, and the court articulated sufficient reasons to conclude that the delay of surgery caused Urizar-Mota's injuries.

brain." He opined that "[i]t's more probable than not that she would not have any injury from such a surgery" before 2018, including because "if the tumor was discovered sooner . . . a more planned and judicious approach could have been made," allowing her to "seek advice from other . . . large brain tumor centers where surgeons do a lot more surgery in this region and have lower complication rates."

In light of this testimony, and upon review of the entire record, we conclude that the district court did not clearly err in concluding that PCHC's delay in imaging and diagnosing Urizar-Mota's brain tumor increased the risk of her surgery and thereby caused her permanent injuries.

D. **Medical Expense Damages**

The final argument raised by the government on appeal is that the district court abused its discretion by awarding damages for Urizar-Mota's post-diagnosis medical expenses. The government specifically argues that Plaintiffs needed, but failed, to introduce an expert to testify about the medical bills, that the court was wrong to rely on Plaintiffs' summary chart compiling Urizar-Mota's medical bills, and that the court's award compensated Urizar-Mota for expenses unrelated to the government's negligence -- specifically, a skin tag removal, day-of-surgery expenses, and a spinal MRI. With one minor exception, we affirm

the district court's award of medical expense damages for the reasons explained below.

## 1. Expert Testimony

The government's argument that Plaintiffs needed experts to testify about the medical bills falls flat because their cited authorities only hold that expert testimony is needed to interpret (1) medical diagnoses -- which Plaintiffs' experts did, or (2) complicated, voluminous evidence in a class action that "is not of the type to which the [factfinder] could simply apply basic math principles in order to calculate damages," -- which is not an issue here because the district judge only had to sum up the medical expenses of a single patient. Petrone v. Werner Enters., Inc., 42 F.4th 962, 969 (8th Cir. 2022). According to the government's own cited authority, "a court may permit the introduction of 'medical records which relate only to the alleged injuries [and] do not require specialized knowledge or skill to understand' without such expert testimony." Hicks v. Craw, No. 5:17-CV-475(TJM/ATB), 2022 WL 3593623, at *7 (N.D.N.Y. Aug. 22, 2022) (quoting Duchnowski v. Cnty. of Nassau, 416 F. Supp. 3d 179, 183 (E.D.N.Y. 2018)) (alteration in original). So too here with Urizar-Mota's medical bills. Further, Urizar-Mota did have experts testify about the connection between the medical records and the procedures reflected on the medical bills. For instance, Dr. Ashley testified about Urizar-Mota's eye injuries

and abnormalities and the post-surgical rehabilitation. Given this record, we do not find the government's argument persuasive.

## 2. Summary Chart

The government's argument that the court should not have admitted and considered Plaintiffs' medical expense summary chart also fails. The government cites no binding authority showing that the court should not have considered the summary chart, citing out-of-circuit authority instead. Neither case supports the government's position.

Petrone, the Eighth Circuit case the government cites, is readily distinguishable: it involved summary evidence of the pay and time records of 55,000 class members, which was "so voluminous and complicated that Plaintiffs' own expert had difficulty correctly calculating damages, demonstrating that this evidence is not of the type to which the jury could simply apply basic math principles in order to calculate damages without the assistance of expert testimony." 42 F.4th at 969. This case is much simpler, involving the type of basic arithmetic a judge can do without specific testimony on calculating damages -- that is, summing up the bills of one plaintiff, Urizar-Mota.

Peat, Inc. v. Vanguard Rsch., Inc., the Eleventh Circuit case cited by the government, instructs that the materials on which a Rule 1006 exhibit is based must be made available for other parties' examination or copying and must be admissible. 378 F.3d

1154, 1160 (11th Cir. 2004).[14]  Both criteria were satisfied here: the medical bills were admitted -- indeed, "the probative value of an authentic medical bill as to the value of the services provided is self-evident," <u>Picard</u> v. <u>Ciulla</u>, 691 F. Supp. 3d 405, 408 (D.N.H. 2023) -- and they were made available to the government, who never objected to their authenticity.  The summary adds no information but simply condenses thousands of produced pages into a more user-friendly format, which is the point of Federal Rule of Evidence 1006.

### 3.    Unrelated Expenses

We agree in part with the government's argument that the medical expense award was excessive.  Upon our review of the record, we hold that Plaintiffs established a causal connection between PCHC's negligence and the medical procedures reflected in Urizar-Mota's bills, except for (1) the inevitable expenses associated with surgery itself, which were already properly excluded by stipulation, and (2) the cost of a spinal MRI, which on our review of the record -- paying particular attention to the testimony of Plaintiffs' expert Dr. Knarik Arkun -- does not seem

---

[14] <u>See generally</u> <u>Martínez</u> v. <u>United States</u>, 33 F.4th 20, 30-31 (1st Cir. 2022) (applying the Federal Rules of Evidence in an FTCA case).  Federal Rule of Evidence 1006 provides a path for presenting charts at trial: a party may use "a summary, chart, or calculation . . . to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court."  Fed. R. Evid. 1006 (a).

to be causally connected to the headache-related negligence and Urizar-Mota's brain tumor.

No expert testified about the spinal MRI's connection to Urizar-Mota's brain tumor or surgery. Indeed, Dr. Arkun's deposition testimony suggests no such connection existed, and Plaintiffs provide no citations to the record linking the spinal MRI to the government's negligence even though they offer such citations for the skin tag removal and day-of-surgery expenses. We therefore agree with the government that Urizar-Mota failed to carry her burden of persuasion of showing that the government's negligence caused her to undergo a spinal MRI, and we will reduce the damages award by the cost of that MRI. This court can modify a damages award without remand "when the record is sufficiently developed." Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 952 (1st Cir. 1995). Here, the record makes clear that only $3,600 of the medical expenses can be attributed to the spinal MRI. This amount can simply be deducted from the total medical expense damages award because the district court "so clearly accepted plaintiff's damages calculations" that "the unjustified portion of the award is easily identified" and "[c]alculation of the excess is mechanical." See Jay Edwards, Inc. v. New England Toyota Distrib., Inc., 708 F.2d 814, 823 (1st Cir. 1983).

The government also challenges the damages award for a skin tag removal from Urizar-Mota's eye, but the record

demonstrates that the removal was part of a course of treatment for Urizar-Mota's eye irritation and vision problems that Plaintiffs proved the government's negligence caused. Similarly, the government challenges the day-of-surgery expenses not already excluded by stipulation, but Plaintiffs credibly linked these to the government's negligence.

The overall medical expenses award, excluding the cost of the spinal MRI, is supported by the evidence and not grossly excessive. We therefore modify the award to $658,594.62, deducting $3,600 for the spinal MRI.

### III.

For all these reasons, the district court's judgment is **affirmed in part and reversed in part**. We hold that the district court lacked jurisdiction over the Reyes Plaintiffs' loss-of-consortium claims and **reverse** the awards of loss-of-consortium damages. We hold that the district court's per-diem calculation of homemaker damages was unsupported by the evidence and grossly excessive in light of the plain meaning of R.I. Gen. Laws § 9-1-47 and therefore **vacate** the homemaker damages award and **remand** with instructions to the district court for further proceedings regarding homemaker damages. We further hold that the district court did not err, or committed only harmless error, as to the breach and causation determinations and accordingly **affirm** the pre- and post-diagnosis pain and suffering

- 50 -

damages awards.  Finally, we **modify** the district court's award of medical expenses, reducing that award by the cost of Urizar-Mota's spinal MRI ($3,600).